[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

Nos. 14-15773, 14-15774
_____

Agency Nos. 16263-11, 2068-12


CHRISTINE C. PETERSON,
ROGER V. PETERSON,

Petitioners - Appellants,

versus

COMMISSIONER OF IRS,

Respondent - Appellee.

_____

Petitions for Review of a Decision of the
U.S. Tax Court
_____

(July 8, 2016)

Before ROSENBAUM and FAY, Circuit Judges, and MIDDLEBROOKS,[*] Judge.

FAY, Circuit Judge:

Christine C. Peterson and Roger V. Peterson[1] appeal the decision of the United States Tax Court, determining deferred compensation payments under corporate plans made after Peterson's retirement from Mary Kay, Inc. ("Mary Kay"), in tax year 2009 were derived from her former Mary Kay association, making them subject to self-employment tax. We affirm in part and dismiss in part.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A. Mary Kay Sales Structure and Commission Compensation

Mary Kay is a manufacturer and seller of cosmetics, toiletries, skin care, and related products. Mary Kay has prospered in the United States and internationally, because of its indigenous, highly incentivized levels of independent sellers, who are commission compensated. A Mary Kay seller can progress rapidly according to her sales and commissions; each advancement is

---

[*] The Honorable Donald M. Middlebrooks, United States District Court Judge for the Southern District of Florida, sitting by designation.

[1] Although Christine C. Peterson and Roger V. Peterson, husband and wife who filed joint tax returns, have litigated these cases together, the issue on appeal concerns Christine Peterson's income from her retirement distributions, derived from her association with Mary Kay. Hereinafter, "Peterson" refers to Christine Peterson, while "Petersons" refers to the taxpayer couple.

more lucrative to the seller and financially beneficial to Mary Kay.  Unique to Mary Kay are its post-retirement, deferred-compensation programs, the ultimate financial incentive for Mary Kay sellers, who have risen through the seller ranks to earn the opportunity to participate in them.

All of Mary Kay's sellers are independent contractors.  The entry level is an independent Beauty Consultant ("BC"), each of whom enters into a written agreement with Mary Kay and commits to develop a customer base to whom they sell Mary Kay products.  BCs buy Mary Kay products wholesale and sell them retail to public customers.  BCs have two responsibilities: (1) to build a customer base and (2) to recruit new BCs, from whom a BC earns commissions on purchases made by their recruited BCs.

When a BC has recruited 24 independent BCs, she can become a Sales Director ("SD"), which involves signing a SD Agreement with Mary Kay.  Her 24 BCs constitute a personal sales unit, from all of whom she earns commissions. A SD has additional responsibilities: she oversees the BCs under her by educating and inspiring them to excel in selling Mary Kay products.  She also continues to acquire additional personal units, from which she earns a percentage of their sales commissions.  BCs within a SD's sales unit may become SDs,

3

resulting in an offspring sales unit, from which the SD continues to earn a percentage of their sales commissions.

A SD is eligible to advance to National Sales Director ("NSD"), the highest level of the Mary Kay sales network, when she has acquired 20 offspring units and is approved for the position by a Mary Kay committee.  An NSD is the only appointed Mary Kay sales position; each is required to sign an NSD Agreement, which states the contingent relationship between an NSD's responsibilities and her commission compensation:

> *NSD recognizes that NSD's earnings as a National Sales Director are contingent upon the results of NSD's efforts in promoting the sale of Mary Kay cosmetics and in inspiring, motivating, counselling and aiding others to become successful sellers of Mary Kay cosmetics and successful Unit Sales Directors.  NSD agrees to assume responsibility for offering effective, conscientious advice and assistance to Beauty Consultants and Unit Sales Directors wishing to avail themselves of NSD's experience and suggestions for building successful Mary Kay businesses of their own.*
>
> *. . . .*
>
> *In consideration of the commission compensation provided under this Agreement and the other rights and benefits provided hereunder, NSD agrees to conscientiously and faithfully employ NSD's best efforts to promote the sale of Mary Kay cosmetics throughout the market area served by Director's Sales Group during the period this Agreement is in effect.*

4

NSD Agreement §§ 8.1, 8.10 (emphasis added).  NSDs generally no longer solicit new Mary Kay customers; instead, they provide training, direction, and motivation through telephone calls, regular meetings, and workshops for Mary Kay sales personnel, especially those in their networks whose wholesale purchases generate their commissions.  The NSD Agreement details an NSD's status, obligations, and compensation relative to commissions from her sales units, based on monthly wholesale purchase volume.[2]  The percentage for calculating an NSD's commissions decreases as the offspring units become farther removed from the NSD's original sales unit.[3]

At the sole discretion of Mary Kay, NSDs, who had maintained a personal sales unit prior to July 1, 1991, were eligible for a Director Unit Volume Bonus based on the NSD's personal sales unit's Monthly Unit Wholesale Purchase

---

[2] Regarding commission compensation, the NSD Agreement applicable in this case states the

> NSD shall have the right to receive from [Mary Kay] *incentive compensation* for NSD's activities in counselling and motivating and promoting retail sales and recruiting efforts of the Units within NSD's Sales Group which shall be in the form of a monthly commission based upon the total monthly wholesale purchases ("Wholesale Purchase Volume") of all *Mary Kay* cosmetics bought for resale by all members of the particular Sales Group counselled and advised by NSD.

NSD Agreement § 3.1 (first emphasis added).

[3] An NSD's commission ranges from 5% to 8% for sales of $3,999.99 or less to $18,000 or more for the Monthly Wholesale Purchase Volume of her First-Line Offspring Sales Unit.  NSD Agreement, Annex I, at I.  An NSD's commission is 3% on her Second-Line Offspring Sales Unit's Combined Monthly Wholesale Purchase Volume and 1/2% on her Third-Line Offspring Sales Unit's Combined Monthly Wholesale Purchase Volume.  *Id.*

Volume, while concurrently serving as an NSD as designated under Annex II of the NSD Agreement. Based on the Monthly Unit Wholesale Purchase Volume, an NSD's bonus ranged from $300 for her sales unit's sales of $4,000 to $5,999 to $3,500 for sales of $40,000 or more. NSD Agreement, Annex II, at II. A Senior NSD also receives a 5% commission, payable on the Wholesale Purchase Volume of the Personal Sales Unit of a First-Line Offspring Director, who becomes an NSD; 3% for a Second-Line Offspring Director, who becomes an NSD; and 2% for a Third-Line Offspring Director, who becomes an NSD. *Id.* The NSD Agreement also subjects the NSD to a noncompetition agreement for two years after termination of her NSD Agreement.[4]

---

[4] The noncompetition agreement in the NSD Agreement provides:

> In consideration of the commission compensation provided under this Agreement and the other rights and benefits provided hereunder, NSD agrees to continuously and faithfully employ NSD's best efforts to promote the sale of *Mary Kay* cosmetics throughout the market area served by Director's Sales Group during the period this Agreement is in effect. NSD further agrees not to engage; directly or indirectly; in soliciting or recruiting Mary Kay Beauty Consultants or other Sales Directors to sell products or services other than those sold by [Mary Kay] during the period this Agreement is in effect and for a period of two (2) years after its termination. NSD further agrees not to utilize, or knowingly permit any other person to utilize, any names, mailing lists or other non-public business information which NSD obtains during NSD's association with [Mary Kay] for recruiting or for promotion of the sale of any other company's products in the United States during the period that this Agreement is in effect and for a period of two (2) years after its termination. NSD further agrees that during the period of NSD's business relationship with [Mary Kay] as a National Sales Director and for a period of two (2) years following date of any termination of such status for any reason, that NSD will refrain from

Relevant to this case, the NSD Agreement clearly provides the status of an

NSD is that of an *independent contractor, who files state and federal tax returns as*

*a self-employed individual*:

> *The relationship created and intended to be created is that NSD acts as an independent contractor for commission compensation measured by the results achieved, the measurement of those results being the Wholesale Purchase Volume of NSD's Sales Group. It is recognized that NSD is not a joint venturer with, or partner, agent or employee of [Mary Kay].* Nothing in this Agreement shall be deemed to permit or empower NSD to conduct business in the name of, or on account of [Mary Kay], or to incur or assume any expense, debt, obligation,

---

directly or indirectly soliciting or inducing any Sales Director or Beauty Consultant to terminate their business relationship with [Mary Kay], whether such solicitation or inducement be for NSD's own account or that of others. NSD further expressly agrees to refrain, during the period of NSD's relationship with [Mary Kay], whether such solicitation or inducement be for NSD's own account or that of others. NSD further expressly agrees to refrain, during the period of NSD's relationship with [Mary Kay] as a National Sales Director and for a period of two (2) years following the date of any termination of such status, from seeking, receiving or accepting, directly or indirectly, any fee, commission, override commission, financial benefit, contract right, monetary or non-monetary reward or other form of compensation from any other company or business organization based on or associated with the solicitation, recruitment, enrollment or association by employment, contract or otherwise for such company or business organization of any person whom NSD knows or has reason to believe is then under contract as a member of the Mary Kay independent sales organization. NSD agrees that [Mary Kay] may have, in addition to any other remedies available at law, an injunction restraining NSD from any violation of the terms of this Section 8.10, and that a temporary restraining order may be issued, without prior notice to NSD, upon sworn application therefor being made by [Mary Kay] setting forth the facts constituting any such alleged violation.

NSD Agreement § 8.10.

7

liability, tax or responsibility in behalf of, or in the name of [Mary Kay] or to act in [Mary Kay's] behalf or to bind [Mary Kay] in any way whatsoever. *[Mary Kay] shall have and reserves no right of power to determine or control the manner, means, modes or methods by which NSD performs NSD's activities or accomplishes NSD's objectives hereunder and shall only look to NSD for results achieved, as measured by the Wholesale Purchase Volume of NSD's Sales Group*.

*As an independent contractor, NSD shall have the obligation to file all necessary income tax returns to reflect self-employment income in a manner required by any applicable state or Federal laws or governmental regulations* and, in connection therewith, [Mary Kay] shall furnish NSD with a statement in the form prescribed by law reflecting all compensation including all commissions, prizes, awards, or other compensation paid by [Mary Kay] to NSD or on NSD's behalf during the year or other legally prescribed reporting period.

*The independent NSD will not be treated as an employee with respect to any services for state or Federal tax purposes, or otherwise*.

*Id.* §§ 11.1, 11.3, 11.4 (emphasis added).

The NSD Agreement clarifies that NSDs are compensated by commissions for sales of their sales units. *They are not salaried employees but independent contractors*, whose incentive to increase their income is based on commissions from sales of their sales units. It is to the financial benefit of an NSD and her sales units working under her to maximize sales of Mary Kay products. Significantly, the NSD Agreement provides: "*[Mary Kay] reserves the right to alter, modify or change any discount, commission and bonus provision of this Agreement from time to time by not less than sixty (60) days' prior written notice to NSD* to be effective

8

on or after the commencement of any annual renewal term of this Agreement."[5]

NSD Agreement § 3.4 (emphasis added).  While Mary Kay has a sales network of

approximately 2.7 million worldwide, there are only 200 NSDs and approximately

155 "emeritus" or retired NSDs.[6]

## B. Mary Kay Post-Retirement, Deferred-Compensation Programs for NSDs

Mary Kay offers two post-retirement, deferred-compensation programs for

which only NSDs are eligible as part of their pay package: (1) the Family

Security Program ("Family Program") and (2) the Great Futures Program

("Futures Program").   Jill Wedding, Mary Kay Director of Consultant

Marketing, testified at trial in the Tax Court: "I don't know another direct selling

company that offers anything like [these Programs]." Trial Tr. 176.  While the

retirement Programs are voluntary, if an NSD participates in either Program, she

must sever her NSD Agreement with Mary Kay at age 65, when the Programs

become effective.  Wedding testified that she had "never seen [an eligible NSD]

---

[5] The NSD Agreement provides it is an annual calendar-year, employment contract : "Unless otherwise terminated pursuant to the provisions hereof, the initial term of this Agreement shall commence on the date first above written and end on December 31 of the same year and the Agreement shall be automatically renewed each January 1 thereafter for additional periods of one (1) year each."  NSD Agreement § 9.

[6] Jill Wedding, Mary Kay Director of Consultant Marketing, testified at trial in the Tax Court that Mary Kay refers to NSDs, who have completed their work for Mary Kay and thereby ended their NSD Agreements  as "emeritus" rather than "retired," because "[w]e just don't use retirement since [NSDs] are self-employed."  Trial Tr. 175.  Nonetheless, we will use "retired" and "emeritus" interchangeably to refer to NSDs no longer actively associated with Mary Kay.

decline" either program, since they are incentive for an NSD to maximize the sales of her area, because the Programs are "so financially lucrative," when she enters emeritus status; this incentive also means "more revenue" for Mary Kay. *Id.*

### 1. Family Program

The preamble of the Family Program, adopted effective July 1, 1991, "recognizes the valuable contribution made by those select group of independent contractors who have attained the coveted position of 'National Sales Director,'" and Mary Kay "desires to establish a program which will offer financial security and other valuable consideration to the National Sales Director and her family." Family Program, Preamble.[7]   To be eligible for the Family Program, an NSD must elect to participate; have an NSD Agreement with Mary Kay; have attained 65, the normal retirement age; and have completed 15 years as an NSD.[8]  Family Program art. I, § 1.1, art. IV, § 4.1.   The election of an NSD to participate in the Family Program is "irrevocable."  *Id.* art. III, § 3.1.  Each NSD who participates in the Family Program "shall continue as a Participant under the Plan so long as she is under contract with [Mary Kay] as an NSD."  *Id.* § 3.2.  "An NSD shall receive

---

[7] Wedding testified the Family Program was "an incentive program to thank [NSDs] for building other successful Mary Kay independent consultants and directors."  Trial Tr. 180.

[8] The Family Program also provides for early retirement at 55 with 5 years of NSD service. Family Program art. IV, § 4.3.

credit for NSD Service commencing with the original effective date of the NSD Agreement executed by the NSD" for as long as she continues "to be an NSD under a current and valid National Sales Director's Agreement, including any subsequent renewal, revision, amendment, modification or replacement" made by Mary Kay to the NSD Agreement. *Id.* § 3.3(b).

The Family Program provides three types of benefits to an NSD and her family: (1) if she dies or (2) becomes disabled after serving one year as an NSD, and (3) financial payments for 15 years *after the NSD takes emeritus status*. The financial payments, which are at issue in this case, are calculated on the average of the highest three years of an NSD's commissions of her last five years before becoming emeritus. The amount the retired NSD is paid results from "a certain percentage [of her former commissions] based on her age when she debuts as an emeritus." Trial Tr. 174. As part of an NSDs' pay package, Wedding testified the Family Program payments are "*based on the services they provided when they were an active independent national sales director*."[9] *Id.* at 184 (emphasis added). An NSD, Family Program participant, who retires at 65 after 15 years as an NSD, receives the highest retirement benefit of 60% of her "Final Average Commissions,

---

[9] Nan Smoot, Mary Kay Director of United States Tax Operations, testified the purpose of the Family Program "is to provide for incentive payments *based on past services*." Trial Tr. 259 (emphasis added). It gave participating NSDs incentive to "increase [their] wholesale area production which would provide for greater compensation in the future." *Id.* at 260.

11

payable for 15 years."[10]  Family Program, Addendum I.   "The Participant's

normal retirement benefit shall be payable in the Normal Form of benefit payment

and shall be payable in monthly amounts equal to one-twelfth (1/12th) of the

annual amount of such benefit."[11]  *Id.* art. V, § 5.1.

The Family Program Agreement clearly states it is not an employment

contract and an NSD, Family Program participant is an independent contractor:

> Plan Not an Employment Contract.  Participant hereby
> acknowledges her *legal status as an independent contractor*, and
> pursuant to Internal Revenue Service Code Section 3508, the
> services she performs as a direct seller [prior to retirement] are
> such that *she is not treated as an employee of [Mary Kay] for
> Federal tax purposes*, or otherwise.  Further, her association with
> the Company is not to be construed as creating an   agency
> relationship, or any other relationship . . . .  *The Plan is not an
> employment contract and it shall not be construed to create or
> otherwise give any NSD any employment right with [Mary Kay].
> The maintenance of the Plan by [Mary Kay] shall not in any
> manner affect [Mary Kay's] rights to alter, modify or terminate its
> contractual arrangement with any NSD.*

*Id.* art. X, § 10.3 (emphasis added).

The Family Program contains a noncompetition agreement that states the

consideration an NSD has received from Mary Kay is its confidential and

---

[10] "'Final Average Commissions' means the NSD's annual average NSD Commissions for the three Plan Years during which the NSD had the highest amount of NSD Commissions during the last five Plan Years of NSD Service."  Family Program art. II, § 2.1(h).

[11] "'Normal Form' means the payment of a retirement benefit, disability benefit or death benefit to or with respect to [an eligible Family Program Participant] (as the case may be) for a period of 15 years from the date on which the first payment of a benefit was made to or with respect to a [Family Program Participant]."  Family Program art. II, § 2.1(n).

12

proprietary information, including marketing, financial, and product-development information as well as sales lists.  In return, an NSD Participant agrees not to use this valuable information outside of Mary Kay for the NSD's profit, which conduct would constitute a breach of the NSD's relationship with Mary Kay and give Mary Kay the right to take legal action against the violating NSD.[12]

---

[12] The noncompetition agreement for the Family Program provides:

Participant acknowledges that, during her association with [Mary Kay] as an NSD, she will have access to valuable information which is highly confidential and proprietary in nature, such as marketing and financial information, product development information and sales organization lists. Participant agrees that she has received valuable consideration from [Mary Kay] in the form of specialized skin care training and sales management training in connection with her qualifications for, and business career as an NSD.  Additionally, *Participant acknowledges that she has received valuable publicity, goodwill, nationwide advertising and promotional support from [Mary Kay] to enhance her business success.  In consideration of the rights and privileges contained in the Plan and other valuable consideration referenced herein, Participant agrees to faithfully observe and comply with the following covenants and agreements for so long as Participant is entitled to receive benefits under the Plan*: (1) Participant agrees not to promote, distribute or sell to other members of the Mary Kay sales organization in the United States of America, without [Mary Kay's] prior written approval, any products or services which are not produced, sold or endorsed in writing by [Mary Kay]; and (2) Participant agrees not to promote, distribute or sell to anyone any products which are not produced, sold and/or distributed by [Mary Kay] in a manner which would falsely designate or suggest, or would be likely to suggest or indicate such products as originating with, or endorsed by [Mary Kay]; and (3) Participant agrees not to engage, directly or indirectly in recruiting Mary Kay Beauty Consultants, Sales Directors or National Sales Directors in the United States of America to sell products or services other than those sold by [Mary Kay], or to utilize, or knowingly permit any other person to utilize, any names, mailing lists or other information which Participant has obtained during Participant's association with [Mary Kay] for recruiting or for promotion of the sale of any other company's products or services; (4) Participant agrees to refrain from directly or indirectly soliciting or inducing any National Sales Director, Sales Director or Beauty Consultant in the United States of America to terminate their business relationship with [Mary Kay], whether such solicitation or

In return for their longevity in overseeing a successful sales network in the United States, the Family Program gives eligible NSDs an opportunity to provide for deferred income following their retirement from Mary Kay with an income percentage of the sales commissions of the sales network the NSD had developed. For an NSD who retired at the normal retirement age of 65,[13] the income amount was 60% of her Final Average Commissions, the average NSD commissions for

---

inducement be for Participant's own benefit or that of others; and (5) Participant agrees to refrain from seeking, receiving or accepting, directly or indirectly, any fee, commission, override commission, financial benefit, contract right, monetary or non-monetary reward or other form of compensation from any other company or business organization based on or associated with the solicitation, recruitment, enrollment or association by employment, contract or otherwise for such company or business organization of any person whom Participant knows or has reason to believe is then under contract as a member of the Mary Kay independent sales organization. Participant agrees that [Mary Kay] may have, in addition to any other remedies available at law, an injunction restraining Participant from any violation of this Section 10.2, and that a Temporary Restraining Order may be issued without prior notice to Participant, upon sworn application therefore being made by [Mary Kay] setting forth the facts constituting any such alleged breach of the Plan provisions.

Family Program art. X, § 10.2 (emphasis added).

[13] "'Normal Retirement Date' means the January 1 immediately preceding or immediately following the date on which the Participant attains age 65 or any January 1 following the date on which Participant has completed 15 years of NSD Service." Family Program art. II, § 2.1(o).

14

the three years the NSD had the highest amount of NSD commissions during the final five Family Program years of NSD service.[14]

## 2. Futures Program

While the Family Program provided post-retirement, commission income to an NSD participant from her domestic sales network, the Futures Program incentivized an NSD to use her leadership skills in Mary Kay's emerging markets in countries outside the United States by affording similar post-retirement, global-network-commission income to an NSD participant. The preamble of the Futures Program "recognizes the valuable contribution made by those select group of independent contractors who have attained the coveted title of 'Independent National Sales Director' . . . within its independent sales organization and have extended their Mary Kay business into certain designated countries beyond the boundaries of the United States of America," and Mary Kay "desires to establish a program which will offer financial reward and other valuable consideration to the NSD and her family." Futures Program, Preamble. Mary Kay established the Futures Program effective January 1, 2005, "for the benefit of its NSDs who have

---

[14] The sales network, commission percentages varied according to the NSD's age at retirement. The percentages ranged from 40% for early retirement at 55 to 58% for retirement at 64. Family Program, Addendum I. An NSD eligible for early retirement under this schedule would "receive the 'Applicable Percentage' of [her] Final Average Commissions, payable for 15 years." *Id.*

15

extended their Mary Kay business into certain designated countries outside of the United States of America." Futures Program art. I, § 1.1.

The normal NSD participant must be "credited with at least 5 years of NSD service" and "*shall discontinue her Mary Kay business in the Applicable GLDP Market(s) . . . as of the Normal Participation Date applicable to such Participant.*"[15] *Id.* art. IV, § 4.1 (emphasis added). "The Normal Participation Date shall be the January 1 immediately preceding or immediately following the date on which such Participant attains age 65" and "such Participant has completed 15 years of NSD Service." *Id.* "[I]n no event shall the Normal Participation Date hereunder be different from the Participant's Normal Retirement Date under Participant's Family Security Program." *Id.* An NSD's election to participate in the Futures Program also is "irrevocable." *Id.* art. III, § 3.1. An eligible NSD who elects to participate in the Futures Program first must have submitted a Participation Agreement and a Beneficiary Designation Form to Mary Kay. *Id.* A retired NSD participating in the Futures Program is eligible to receive monthly

---

[15] GLDP means Global Leadership Development Program, which was created by Mary Kay "to give those experienced members of its independent sales organization, specifically Independent Sales Directors and Independent National Sales Directors, the opportunity to enhance their income earning potential by extending their Mary Kay business beyond the United States of America into certain designated countries." Futures Program art. II, § 2.1(j).

16

Normal Participation Awards "based on the NSD GLDP Commissions of the Participant's Great Futures Area for the applicable month."[16]  *Id.* art. V, § 5.1.

Like the Family Program, retired NSDs, with a minimum of 5 years as an NSD, earn commission percentages of sales of their foreign sales units depending on their age at retirement.  These percentages range from 40% for retirement at 55 to 60% for retirement at 65, paid monthly for 12 years.[17]  Futures Program, Addendum I.  The Futures Program contains a noncompetition agreement with the same provisions as the noncompetition agreement in the Family Program for a retired NSD participant.  Futures Program art. X, § 10.2.  The Futures Program also provides disability and death benefits payable to the NSD's designated beneficiary.  Futures Program art. V, § 5.3, 5.4.

---

[16] NSD GLPD Commissions refers to "all commissions paid to an NSD by [Mary Kay] for her business as an NSD in each respective" country outside the United States, "based on the total Net Wholesale Volume Production and the GLDP commission schedule in effect."  Futures Program art. II, § 2.1(r).  NSD GLPD Commissions "includes both the annual NSD Offspring Development Bonus for NSD offspring and the annual, qualified, first-line Independent Sales Director Offspring Development Bonus."  *Id.*  "The term does not include other commissions from her personal unit, or other prizes, contests or awards."  *Id.*  Great Futures Area "means Participant's NSD GLDP Commissionable Area existing," when the NSD retired "*in exchange for the opportunity to participate in*" the Futures Program.  *Id.* art. II, § 2.1(k) (emphasis added).  "Great Futures Area shall be as composed" in each country outside the United States, when the NSD's participation in the Futures Program becomes effective, "subject only to any growth or reduction within the Great Futures Area, including debut of new units and termination of existing units, in each" country.  *Id.*

[17] "The monthly award for those [NSD] Participants under Normal Participation [65 at retirement] is 60% of NSD GLDP Commissions of the Participant's Great Futures Area for that particular month, subject to Participant's Great Futures Area having Net Wholesale Volume Production for the respective month, for twelve (12) consecutive years."  Futures Program, Addendum I.

As in the Family Program, an NSD under the Futures Program receives the designated percentage of commissions from her foreign sales units after she retires and is no longer providing training and motivation to them. If she effectively trained her sales units while she was an active NSD, then her foreign sales units should be able to continue to produce the same level of sales "after she's no longer providing services." Trial Tr. 272. The incentive to an NSD is to maximize training her foreign sales units; if they continue to produce, she enhances her retirement commission compensation as well as Mary Kay's profits. If she does not train them to produce successfully, then they will not perform well after the NSD's retirement, and her post-retirement commission compensation will diminish accordingly.

Regarding the Futures Program as it related to post-retirement commissions of an NSD who had trained sellers in emerging markets in foreign countries, Nan Smoot, Mary Kay Director of United States Tax Operations, likened Mary Kay's Futures Program to "succession planning in a normal office environment." *Id.* at 313. In building a foreign market for Mary Kay products, it takes time "for [sellers abroad] to catch the excitement that the national sales director hopefully is, in those services she's providing to that country." *Id.* While the fruition of the sales of the NSD may be delayed by "teaching [the foreign sellers] the right things," they "will be successful because you taught them well." *Id.* at 313-14.

18

Consequently, by "providing education, training, team building, motivation, [which] is sustainable going forward . . . that ability will continue and . . . will be reflected in future sales." *Id.* at 313. While initial sales in a new foreign market would not be comparable to sales in a new market in the United States, the foreign sales were expected to increase under the training and guidance of the NSD.[18] Developing a foreign Mary Kay sales market for an NSD, who knew she would be retiring within a few years, was a timely incentive to invest her efforts there, because she would benefit financially in retirement with the success of her foreign sales units after she retired, as would Mary Kay.

Additionally, like the Family Program, the Futures Program Agreement provides the participating NSD is an independent contractor without employment rights with Mary Kay:

> Program Not an Employment Contract. Participant hereby acknowledges her *legal status as an independent contractor*, *and the services she performs as a direct seller are such that she is not treated as an employee of [Mary Kay] for Federal tax purposes, or otherwise*. Further, her association with [Mary Kay] is not to be construed as creating an agency relationship, or any other relationship other than as previously stated in this Section 10.3. *The Program is not an employment contract and it shall not be construed to create or otherwise give any NSD any employment rights with [Mary Kay]*. The maintenance of the Program by

---

[18] Smoot testified that Peterson "provided [sales] services in Mexico and there were three or four other countries that she provided services to, although they were very, very small." Trial Tr. 270. Consequently, Peterson's Futures Program foreign commissions were considerably less than her commissions from the domestic Family Program.

19

*[Mary Kay] shall not in any manner affect [Mary Kay's] rights to alter, modify or terminate its contractual arrangement with any NSD.*

Futures Program art. X, § 10.3 (emphasis added).

## C. 2008 Amendments to NSD Retirement Programs

Both the Family Program and the Futures Program provided Mary Kay could "amend, modify or terminate" them "at any time and in any manner." Family Program art. VIII, § 8.1; Futures Program art. VIII, § 8.1. Effective December 1, 2008, Mary Kay amended both Programs under article VIII, § 8.1 with the respective prefacing explanation: "*Mary Kay Inc. acting through its Board of Directors hereby amends the Program as follows to comply with the new tax rules under Internal Revenue Code Section 409A.*" Preface to Mary Kay 2008 Amendment No. 1 to the Family Program & Futures Program. Accordingly, article X of each Program was amended by adding section 10.9, stating "Section 10.9 is added to specifically reflect compliance with Section 409(A) of the Internal Revenue Code:"

> Internal Revenue Code Status. *The Program [Plan] is intended to be a non-qualified deferred compensation arrangement* and is not intended to meet the requirements of Section 401(a) of the Code. *The Program [Plan] is intended to meet the requirements of Section 409A of the Code and shall be construed and interpreted in accordance with such intent.* No person connected with the Program [Plan] in any capacity, including but not limited to [Mary Kay] and any affiliates of

20

[Mary Kay] and their respective directors, officers, agents and employees, makes any representation, commitment or guarantee that *any tax treatment, including but not limited to federal, state and local income, estate, and gift tax treatment, will be applicable with respect to any amounts deferred or payable under the Program [Plan] or that such tax treatment will apply to or be available to a Participant on account of participation in the Program [Plan].*[19]

Mary Kay Amend. No. 1, § 10.9, Family Program & Futures Program (emphasis added).

Smoot testified she was involved in drafting the Mary Kay Amendments for the Family Program and Futures Program in 2008 to ensure they complied with IRS regulation 409A. She explained the IRS "did not want a receiver of income to be able to manipulate what year they received the income"; "if . . . deferred compensation plans were not compliant with the 409A rules, . . . the person who would be receiving the payments, would be subject to a 20 percent penalty on the plan amounts" plus "100 percent of all amounts under the plan to be paid in the future, that amount would be subject to tax up front." Trial Tr. 285, 286. Consequently, Smoot testified the 2008 Amendments to the Family and Futures Programs were favorable to a participating NSD, because, instead of the 20 percent penalty, the regular income tax rate would have applied "on all future payments covered under the contract." *Id.* at 286. As the Tax Court judge clarified with Smoot, this penalty tax would have been imposed "*before receipt*," if the Program

---

[19] The Amendment to the Family Program uses "Plan" instead of "Program."

21

did "not comply with [the IRS 409A] rules," which Smoot testified would be "pretty onerous" to the NSD participants.  *Id.* at 286, 287 (emphasis added). Through the 2008 Amendments, Smoot testified the intent of Mary Kay was to make "extremely clear to the IRS" that the 409A rules applied, which was to the benefit of the NSDs participating in the Family Program and Futures Program.  *Id.* at 289.

In response to the judge's inquiry concerning the significance of a nonqualified- deferred-compensation arrangement, Smoot responded the participant NSDs are "independent contractors," and "*there's no way to have a qualified pension plan for a non-employee. So, it had to be a non-qualified plan. It's not a pension arrangement under 401.*"  *Id.* at 288 (emphasis added).   For tax purposes, Smoot explained Mary Kay treated payments to NSDs under the Family Program and Futures Program as *deferred compensation based on past services*, making them ordinary deductions for Mary Kay.  She testified the 2008 Amendments did not change Mary Kay's tax reporting regarding these Programs: "We have always treated the [Program] payments as payments for past services" or deferred compensation.  *Id.* at 293.  This deferred-compensation treatment for payments under the Family Program and Futures Program is shown by Mary Kay on its books, tax returns, and reported to the IRS as nonemployee compensation on Form 1099-MISC.

**D. Peterson's Mary Kay Career**

Peterson became an independent BC for Mary Kay in the summer of 1982 in the San Diego, California, area. Because she was extremely successful at selling Mary Kay products and recruiting new BCs, Peterson had acquired 14 personal sales units and became a SD in March 1983. Three months later, she had a pink Cadillac, which was acquired by a SD with a sustained high sales level for six months.

Peterson and her husband subsequently moved to Houston, Texas, for several years, where she became an NSD within her first nine years with Mary Kay. On July 1, 1991, Peterson signed her National Sales Director Agreement with Mary Kay, which enabled her to earn commissions on wholesale purchases of Mary Kay products by her network of independent BCs, SDs, and NSDs. Wedding testified Peterson was "in the top ten," sometimes in the top two or three in ranking of all Mary Kay NSDs, based on sales commissions. Trial Tr. 192.

Peterson and her husband, who was her business partner, next moved to Chicago, Illinois, for approximately four years.[20] Thereafter, the Petersons moved to Atlanta, Georgia, for approximately eight years. Peterson testified that the

_____

[20] Peterson's husband, who had sold real estate and was retired, instructed her in marketing. He had suggested that they move to Houston and Chicago, respectively the fourth and third largest cities in the United States, for increased ability to add to Peterson's Mary Kay sales units.

23

moves to large cities were to increase her  potential to develop new personal sales units, which generated her commissions.  She explained: "[W]e have no territories. . . . So I can keep [sales units] that I'd already built," while adding new ones.  *Id.* at 205.  As an NSD, Peterson did not continue to sell products but focused on educating, training, and inspiring her sales units and offspring to sell Mary Kay products and become NSDs.  At trial, Peterson testified her relationship to Mary Kay "was an independent contractor," meaning "I was in business for myself." *Id.* at 209, 210.  She explained: "I was building my business to sell back . . . . I was building a business.  That's why I was running so hard."  *Id.* at 211.

As part of Peterson's NSD compensation package, she was offered the opportunity to participate in the Family Program and the Futures Program.  On November 1, 1992, Peterson entered into the Family Program Agreement, which became effective for her as of July 1, 1991.  Peterson signed the Futures Program on July 1, 2005; she and her husband executed the Beneficiary Designation Form for the Futures Program on January 18, 2011, and designated their daughter, Shannon Andrews, as the beneficiary.  Peterson continued as a highly successful NSD for almost 19 years.  The year before her retirement in 2009, she had an international network of approximately 23,000 individuals and received commissions on wholesale purchases in excess of $15,000,000.

24

By a Mary Kay letter dated September 26, 2008, Peterson received notice and copies of the 2008 Amendments to the Family Program and Futures Program to comply with amendments made to the Internal Revenue Code by section 409A. The letter informed "the revisions contained in these amendments make no substantive change to the benefits available under the Programs. The changes simply clarify the language of the Programs to make it absolutely clear that all provisions are in compliance with section 409A." Mary Kay letter to Peterson (Sept. 26, 2008). The letter stated the Amendments would become effective on December 1, 2008. *Id.*

The Mary Kay letter also included Frequently Asked Questions concerning the provisions of section 409A of the Internal Revenue Code.

> Section 409A generally provides that *unless specified requirements are met, all amounts deferred under a nonqualified deferred compensation plan for all taxable years are currently includable in the recipient's gross income and therefore subject to immediate taxation, and the recipient may be assessed potential interest and penalties*. Under section 409A, a nonqualified deferred compensation plan is generally any plan that provides for the deferral of compensation. *The deferral of compensation occurs generally if under the terms of the plan and the relevant facts and circumstances, the service provider has a legally binding right during a taxable year to compensation that is or may be payable in a later taxable year*.

Mary Kay letter to Peterson, Frequently Asked Questions at 1 (Sept. 26, 2008) (second & third emphases added). Specifically addressing the effect of the

25

Amendments on the Family Program and Futures Program, the Frequently Asked

Questions informed:

> *Section 409A is broad in its application and specifically covers payments to independent contractors that are made on a deferred basis*, unless certain specific exceptions are met.  *Because payments under the Family Security Plan and Great Futures Program begin when you cease active NSD service and are paid out into the future, it appears that these Programs likely fall within the broad definitions applied to section 409A and they were therefore amended to be 409A compliant.*

*Id.* (emphasis added).  Regarding Peterson's notice of the 2008 Amendments,

which stated her commission compensation under the Family Program and Futures

Program would be nonqualified deferred compensation, Smoot testified Mary Kay

heard "[n]ot a word" from Peterson.  Trial Tr. 290.

Peterson retired from Mary Kay on January 1, 2009, the year she became 65,

after being an NSD for almost 19 years.  Consequently, she was entitled to receive

60% of the applicable commissions each year through 2023 under the Family

Program and through 2020 under the Futures Program.  In 2009, Peterson received

$408,133.44 under the Family Program and $12,840.87 under the Futures Program,

totaling $420,974.31.  Mary Kay reported those Program payments as

Nonemployee Compensation on Form 1099, issued to Peterson for tax year 2009.[21]

---

[21] In addition to the 2009 Program payments, the Nonemployee Compensation reported on Peterson's Form 1099 included non-Program commissions of $68,732.87 she earned in 2008, which were paid to her in January 2009.

Despite the noncompetition agreements under her NSD, Family Program, and Futures Program Agreements, Peterson testified she "joined another networking company to start a new business in Isagenix," which sells health and nutritional products. *Id.* at 222.   In a conference call, Isagenix asked Peterson to relate her sales experience, including comparing the sales operation of Mary Kay and Isagenix. *Id.*  Wedding testified Mary Kay learned Peterson had made "some derogatory comments" about Mary Kay during this "conference call with another direct selling organization," after her Mary Kay retirement. *Id.* at 170.   As a result of these comments, Mary Kay informed Peterson of being "disappointed" in her. *Id.* at 223.  Consequently, Peterson testified Mary Kay did not permit her to go on a Greek cruise, one of three cruises she was entitled to take in her first five years of retirement under the Family Program. *Id.* at 223-24.  Peterson was not further penalized for her perceived derogatory comments about Mary Kay, and never stopped receiving her monthly retirement commissions under the Family Program and Futures Program from Mary Kay.  To date, Peterson's monthly commission payments from the Family Program and Futures Program have continued uninterrupted.

**E. Petersons' Businesses and Tax Reporting**

In 1991, Peterson hired financial advisor Craig Foster and his company, First Tax, to assist her with an IRS audit; he also assisted her with a subsequent tax audit. Pleased with Foster's services, the Petersons sought his advice regarding their estate planning and asset protection. Following Foster's advice, the Petersons created several business entities. On April 1, 2000, they established the Christine Peterson Defined Benefit Plan and Trust ("CP Plan") and designated themselves as trustees with Peterson as the employer. The Petersons formed NSD Interests, L.P. ("NSD Interests"), a Georgia limited partnership in December 2002. The Petersons were limited partners of NSD Interests with NSD Management as the managing general partner. Peterson and her husband were respectively president and secretary of NSD Management. For NSD Management to pay compensation to the Petersons, Foster testified NSD Interests, the "limited partnership, as a part of its ordinary and necessary business expenses, paid management fees to the managing general partner for the services that it rendered through the use of its employees," the Petersons. Trial Tr. 127.

Peterson attempted to assign her Mary Kay commissions to NSD Interests before her retirement. The assignment was ineffective, because Mary Kay did not consent. On December 29, 2003, NSD Interests entered into an adoption agreement relating to the NSD Interests, L.P., Defined Benefit Plan and Trust ("NSD Plan"). The adoption agreement provided it amended and restated the CP

28

Plan, the previously established qualified plan of the employer, effective January 1, 2000.  The NSD Plan designated NSD Interests as the employer and the Petersons as trustees.

First Tax prepared all the agreements creating the business entities for the Petersons and prepared their tax returns for the years involved in this litigation, 2006-2009.  Foster testified regarding the interrelationship of the business entities his company had created for the Petersons:

> There were several ways in which Mrs. Peterson and her husband both received monies from the limited partnership.  They received compensation from the management company as officers of the management company for services that they were rendering on behalf of the business.  They received fringe benefits and allowances for doing the same.  They were provided a pension plan through the company for the same, just like any other normal company.  And then in their role as limited partners, the partnership distributed the excess profits to them directly through Form K1 as the distribution items.

*Id.* at 66.  For tax purposes, Foster considered the distributive share of limited partner NSD Interests as not being subject to self-employment tax, because "it was passive income."  *Id.*

Regarding Peterson's 2009 commission payments from the Mary Kay Family Program after her retirement, Foster considered those payments to be either of two types of characterizations.  First was a retirement plan that "was not pre-funded" with no effect on the balance sheet of Mary Kay, which "simply paid as

29

they went with respect to this as a promise to the taxpayer." *Id.* at 70.  Second was the "purchase of [Peterson's Mary Kay] business because there was a covenant not to compete, there was good will associated with it, there was the sale of the assets of all of the clients' business and activities, and [she was] prohibited from any kind of activity involved in Mary Kay going forward." *Id.*  Foster, however, chose to characterize Peterson's emeritus-commission income under the Family Program as "retirement income, ordinary income but clearly not subject to self-employment tax, because they had no more earnings associated with it." *Id.* at 71.

Mary Kay reported nonemployee compensation to Peterson of $750,127 in 2006, $799,191 in 2007, and $892,543 in 2008.  In 2009, Peterson retired from Mary Kay, which reported nonemployee compensation to her under the Family Program and Futures Program of $489,707.  The Petersons timely filed their 2006, 2007, 2008, and 2009 joint federal tax returns.  On Schedule C, Profit or Loss From Business, the Petersons reported "Other Expenses" equivalent to Peterson's nonemployee commission compensation from Mary Kay, which are deductions not subject to self-employment tax.  NSD Interests timely filed federal income tax returns for the same years and reported gross receipts of $750,127, $799,191, $892,543, and $489,707, the identical amounts reported on the Petersons' Schedules C.  NSD Interests claimed deductions of $275,365, $312,266, and

30

$173,500 for retirement contributions to the NSD Plan relating respectively to tax years 2006, 2007, and 2008.

The Petersons used the same tax-accounting methods in 2009 as they had in tax years 2006 through 2008. They reported Peterson's income from the Family and Futures Programs as "gross receipts or sales" on their joint tax return and claimed a deduction in an amount equal to the Mary Kay payments, characterizing the claimed deduction as "nominee income" of NSD Interests to avoid self-employment tax. The Program payments were reported on the 2009 tax return of NSD Interests.

## F. Tax Court Proceedings

The IRS sent the Petersons a notice of deficiency relative to tax years 2006 and 2007 on April 7, 2011, and a notice of deficiency for tax years 2008 and 2009 on October 18, 2011. The notices advised the Petersons were subject to self-employment tax for their distributive shares of net partnership income reported by NSD Interests and had incurred accuracy-related penalties under IRS Code section 6662(a). Residing in Florida, the Petersons timely filed petitions with the Tax Court on July 11, 2011, and January 23, 2012. In amendments to answers filed on August 30, 2012, and December 13, 2012, the IRS determined NSD Interests was not engaged in a trade or business during the subject years; deductions made by

31

NSD Interests were not ordinary and necessary expenses; all income reported to NSD Interests was allocable to Peterson; NSD Interests did not qualify as an employer under IRS Code section 401(c)(4); and Peterson's nonemployee Mary Kay compensation was subject to self-employment tax.  The Petersons petitioned the Tax Court for redetermination of their tax deficiencies.  Following concessions, two issues remained for the Tax Court to decide: (1) whether retirement-plan contributions made by NSD Interests for 2006, 2007, and 2008 were deductible under IRS Code section 404(a), and (2) whether distributions received by the Petersons during 2009 under the Family Program and the Futures Program were subject to self-employment tax.

Following trial, the Tax Court issued its Memorandum Findings of Fact and Opinion.  *Peterson v. Comm'r*, 106 T.C.M. (CCH) 619 (2013).  The Tax Court determined NSD Interests was not entitled to deduct retirement-plan contributions for tax years 2006, 2007, and 2008, because it was not engaged in a trade or business during those years.[22]  The Tax Court, however, concluded Peterson was

---

[22] Regarding whether NSD Interests was engaged in a business during tax years 2006, 2007, and 2008, the Tax Court reasoned:

Petitioners concede that NSD Interests "was not engaged in a trade or business in 2008 . . . and was merely the passive recipient of income".  Mrs. Peterson readily acknowledged that NSD Interests was merely a "structure" to hold her Mary Kay earnings and that it was created "for the tax savings".  Furthermore, petitioners concede that during 2006, 2007, and 2008, NSD Interests had no income and that the income reported on its returns should have been

32

an employer for the CP Plan, which entitled her to deduct the retirement

contributions for tax years 2006, 2007, and 2008.[23]   The Tax Court decided

Peterson's 2009 retirement distributions from the Family Program and Futures

Program were derived from her former Mary Kay business, and the Agreements

for both Programs provided they were deferred compensation, which made these

distributions subject to self-employment tax.[24]

---

reported on petitioners' returns.  In sum, NSD Interests was not engaged in a trade or business during 2006, 2007, and 2008.  Accordingly, NSD Interests is not entitled to deduct retirement plan contributions relating to these years.

*Peterson*, 106 T.C.M (CCH) 619,*3 (citations omitted).

[23] In concluding Peterson was entitled to deduct retirement contributions under the CP Plan for tax years 2006, 2007, and 2008, the Tax Court explained:

Respondent concedes that the NSD plan is valid; Mrs. Peterson "was engaged in carrying on a Mary Kay business during the taxable years 2006, 2007, and 2008"; and certain "expenses that were originally reported on the Form 1065 for NSD Interests are allowable as deductions and are reportable on Schedule[s] C of petitioners' Form[s] 1040".  Mrs. Peterson formed the CP Plan and was designated as the employer pursuant to it.  On December 29, 2003, NSD Interests amended and restated the CP Plan.  The NSD Plan defined an "Employer" as "the entity specified in the Adoption Agreement, any successor which shall maintain this Plan and any predecessor which has maintained this Plan."  Mrs. Peterson (i.e., a predecessor who maintained the plan) was an "Employer" pursuant to the NSD Plan, and the retirement contributions were "expenses which would be deductible under section 162".  Accordingly, Mrs. Peterson is entitled to deduct, pursuant to section 404(a), the retirement contributions relating to 2006, 2007, and 2008.

*Id.* (citations and footnote omitted) (alterations in original).

[24] Concerning its conclusion the 2009 retirement distributions from the Family Program and Futures Program were subject to self-employment tax, the Tax Court reasoned:

33

The Tax Court decision, issued in Case No. 16263-11, concerned the

Petersons' reporting for tax years 2006 and 2007, before Peterson retired.  Tax

Court Case No. 2068-12 dealt with the Petersons' reporting for tax years 2008 and

2009.  The Petersons' notice of appeal to this court states they are appealing the

attached Tax Court decision, "determin[ing] deficiencies Petitioners owe for 2008

and 2009 Federal income tax."  Notice of Appeal (Dec. 29, 2014).  This is Tax

Court Case No. 2068-12.  The Tax Court decision in Case No. 16263-11,

concerning the Petersons' income-tax deficiencies for tax years 2006 and 2007,

---

Petitioners contend that the distributions they received during 2009 pursuant to the FSP [Family Security Program] and the GFP [Great Futures Program] agreements are not subject to self-employment tax.  We disagree. Section 1401 imposes a tax on a taxpayer's self-employment income.  *Self-employment income consists of gross income derived by an individual from any trade or business carried on by that individual.  Mrs. Peterson formerly carried on a trade or business.*  Therefore, Mary Kay's 2009 distributions pursuant to the FSP and the GFP agreements are subject to self-employment tax if they were "derived" from Mrs. Peterson's business . . . . *Pursuant to the FSP agreement, Mrs. Peterson's distributions were based on her average commissions over the five years prior to her retirement.  Pursuant to the GFP agreement, Mrs. Peterson's distributions were based on the postretirement wholesale volume of her network (i.e., how well the network performed based on her prior services). . . . Moreover, the FSP and the GFP agreements expressly provided that the distributions were deferred compensation (i.e., related to Mrs. Peterson's prior labor).  Petitioners failed to adduce proof sufficient to alter the construction of these unambiguous agreements or show that they were unenforceable. Accordingly, the 2009 FSP and GFP distributions are subject to self-employment tax pursuant to section 1401*.

*Id.* (citations omitted) (emphasis added).

34

was not attached to the notice of appeal; they do not address it on appeal.[25]

Nonetheless, Tax Court Case No. 16263-11 was assigned Appeal No. 14-15773 in this court, and Tax Court Case No. 2068-12 was assigned Appeal No. 14-15774 in this court, apparently because these cases were consolidated in the Tax Court.

Both parties agree that only Tax Court Case No. 2068-12, our Appeal No. 14-15774, was appealed.[26] In their reply brief, the Petersons further clarify they specifically have appealed only tax year 2009, for which the Tax Court found their tax deficiency for self-employment tax to be $33,594. Accordingly, the sole issue we address is whether the 2009 distributions from the two Mary Kay post-retirement Programs are subject to self-employment tax, a first-impression issue for this circuit.

## II. ANALYSIS

---

[25] We lack jurisdiction to decide a case improperly appealed procedurally. *See* Fed. R. App. P. 3(c)(1) ("The notice of appeal must . . . (B) designate the judgment, order, or part thereof being appealed . . . ."); Fed. R. App. P. 13(a)(3) (stating "Rule 3 prescribes the contents of a notice of appeal" from a Tax Court decision).

[26] The Commissioner notes: "Because taxpayers did not file a notice of appeal from the decision in Tax Court Case No. 16263-11, this Court lacks jurisdiction and should dismiss No. 14-15773." Appellee's Br. at xvi. The Commissioner further suggests: "It appears that the Clerk of the Tax Court misinterpreted the notice of appeal as appealing from both decisions . . ., presumably because the cases had been consolidated and the notice of appeal was filed [incorrectly] in both. The docketing of No. 14-15773 appears to have resulted from that clerical error." *Id.* at n.2 (citations omitted). In their Reply Brief, the Petersons state: "Peterson concurs that this Court does not have jurisdiction over Tax Court Case No. 162[6]3-11 and this Court's Case No. 14-15773 because Peterson appealed only tax year 2009." Appellants' Reply Br. at 1.

35

We have jurisdiction to review decisions of the Tax Court on appeal "in the same manner and to the same extent as decisions of the district courts in civil actions tried without a jury." 26 U.S.C. § 7482(a)(1). "Generally, the Tax Court's findings of fact, like those of a district court, are subject to the 'clearly erroneous' standard of review." *Steffens v. Comm'r*, 707 F.2d 478, 482 (11th Cir. 1983) (quoting *Comm'r v. Duberstein*, 363 U.S. 278, 291, 80 S. Ct. 1190, 1200 (1960)); *see Patterson v. Comm'r*, 740 F.2d 927, 930 (11th Cir. 1984) ("The tax court's finding that an additional tax is due will not be overturned unless clearly erroneous."). But "the Tax Court's rulings on the interpretation and application of the statute are conclusions of law subject to *de novo* review," and its "findings of ultimate fact which result from the application of legal principles to subsidiary facts are subject to *de novo* review." *Estate of Wallace v. Comm'r*, 965 F.2d 1038, 1044 (11th Cir. 1992) (citations, internal quotation marks, and alterations omitted). "The taxpayer has the burden of showing that [s]he did not negligently or intentionally disregard the [tax] rules." *Patterson*, 740 F.2d at 930. We may affirm the Tax Court on any grounds supported by the record. *See Steffens*, 707 F.2d at 483.

**A. Self-Employment Tax and Deferred Compensation**

Under the Internal Revenue Code, "[t]he term 'self-employment income' means the net earnings from self-employment derived by an individual . . . during any taxable year." 26 U.S.C. § 1402(b). Net earnings are defined as "the gross income derived by an individual from any trade or business carried on by such individual" less deductions, which are inapplicable to this case.[27] 26 U.S.C. § 1402(a). "A tax is imposed on 'self-employment income' in order to fund social security benefits for self-employed individuals." *Patterson,* 740 F.2d at 929 (citing 26 U.S.C. §§ 1401, 1402(b)). For those who are self-employed, "it is the counterpart of the taxes imposed on wages of employees by the Federal Insurance Contributions Act (FICA)."[28] *Steffens*, 707 F.2d at 481 (citing *Newberry v. Comm'r*, 76 T.C. 441, 443 (1981)).

To be self-employment income, "there must be a nexus between the income received and a trade or business that is, *or was*, actually carried on." *Newberry*, 76 T.C. at 444 (emphasis added). In addition, the income "must arise from some *actual (whether present, past, or future) income-producing activity of the taxpayer before such income becomes subject to . . . self-employment taxes*." *Id.* at 446

---

[27] The legislative history of the self-employment-tax provisions shows Congress included the possibility self-employed individuals could continue to receive income from their trade or business after retirement. *See* S. Rep. No. 81-1669, at 30 (1950), *reprinted in* 1950 U.S.C.C.A.N. 3287, 3319.

[28] The Self-Employment Contributions Act ("SECA"), 26 U.S.C. §§ 1401-1403, "imposes the equivalent of the sum of the employee and employer FICA taxes for employees." *Umland v. PLANCO Fin. Servs., Inc.*, 542 F.3d 59, 61 (3d Cir. 2008).

37

(emphasis added).  "The self-employment tax provisions are broadly construed to favor treatment of income as earnings from self-employment."  *Bot v. Comm'r*, 353 F.3d 595, 599 (8th Cir. 2003).

In enacting 26 U.S.C. § 409A, Congress titled it "Inclusion in gross income of deferred compensation under nonqualified deferred compensation plans."  The statute defines a "nonqualified deferred compensation plan" as "any plan that provides for the deferral of compensation," other than exceptions not applicable to this case.  26 U.S.C. § 409A(d)(1).   A plan provides for a "deferral of compensation" where, "under the terms of the plan and the relevant facts and circumstances, *the service provider has a legally binding right during a taxable year to compensation that . . . is or may be payable to . . . the service provider in a later taxable year*."  Treas. Reg. § 1.409A-1(b)(1) (emphasis added).  "The term 'plan' includes any agreement or arrangement, including an agreement or arrangement that includes one person."  26 U.S.C. § 409A(d)(3).  The consequences of not including deferred compensation under a nonqualified, deferred compensation plan are interest and a penalty of "20 percent of the compensation which is required to be included in gross income."  26 U.S.C. § 409A(a)(1)(B)(i)(II).  "It is well settled law that the Commissioner of the Internal Revenue Service, in determining income tax liabilities, may look through the form

of a transaction to its substance." *Bradley v. United States*, 730 F.2d 718, 720 (11th Cir. 1984).

The Tax Court concluded the Petersons do not dispute the 2008 Amendments to the Family Program and the Futures Program expressly characterize them as "deferred compensation (i.e., related to Mrs. Peterson's prior labor)." *Peterson*, 106 T.C.M. (CCH) 619, *3. Under the "*Danielson* rule," that characterization is controlling for tax purposes. *Comm'r v. Danielson*, 378 F.2d 771, 775 (3d Cir. 1967) (en banc); *Spector v. Comm'r*, 641 F.2d 376, 384-86 (5th Cir. Unit A Apr. 1981) (adopting the *Danielson* rule). Our court has explained the *Danielson* rule:

> When a taxpayer characterizes a transaction in a certain form, the Commissioner may bind the taxpayer to that form for tax purposes. This is the rule: "a party can challenge the tax consequences of his agreement as construed by the Commissioner only by adducing proof which in an action between the parties [to the agreement] would be admissible to alter that construction or to show its unenforceability because of mistake, undue influence, fraud, duress, et cetera."

*Plante v. Comm'r*, 168 F.3d 1279, 1280-81 (11th Cir. 1999) (quoting *Danielson*, 378 F.2d at 775) (citation and alteration omitted). Because Peterson had signed the retirement Program Agreements respectively in 1992 and 2005 permitting Mary Kay to amend them prospectively, she necessarily had consented to the 2008

39

Amendments that expressly characterized the Family Program and Futures

Program payments as "deferred compensation" under a nonqualified compensation

plan pursuant to Section 409A of the Internal Revenue Code,[29] which makes the

*Danielson* rule applicable.[30]  *See Comm'r v. Nat'l Alfalfa Dehydrating & Milling*

---

[29] The dissent asserts Peterson never consented to the 2008 Amendments to the Family Program and Futures Program, which characterize Program payments as deferred compensation under a nonqualified compensation plan pursuant to Section 409A of the Internal Revenue Code. But that is precisely the type of change or clarification to which she agreed under the terms of the two Mary Kay retirement Programs into which she voluntarily elected to enroll. Neither standard Program Agreement was personalized for Peterson other than to place her name at the top of each Agreement. Both the Family Program and the Futures Program contain identical provisions permitting the Mary Kay Board of Directors to "*amend, modify or terminate*" either Program "*at any time and in any manner.*" Family Program art. VIII, § 8.1; Futures Program art. VII, § 8.1 (emphasis added). By signing each Program Agreement, Peterson entered into separate Mary Kay retirement Program Agreements specifically and unambiguously providing Mary Kay could change the Program Agreements unilaterally at any time and in any way.

[30] The *Danielson* rule was adopted by the former Fifth Circuit in *Spector*, 641 F.2d at 384-86, and expressly adopted in this circuit in *Bradley*, 730 F.2d at 720, and *Plante*, 168 F.3d at 1280-81. "Under the well-established prior panel precedent rule of this Circuit, the holding of the first panel to address an issue is the law of this Circuit, thereby binding all subsequent panels unless and until the first panel's holding is overruled by the Court sitting en banc or by the Supreme Court." *Smith v. GTE Corp.*, 236 F.3d 1292, 1300 n.8 (11th Cir. 2001). Nevertheless, the dissent announces the *Danielson* rule does not apply in this case, because the facts are different from those in *Danielson* and *Plante*. Such an approach would abolish our prior panel precedent rule, since the facts of any two cases are rarely, if ever, identical.

Our circuit has applied the *Danielson* rule in cases involving various factual situations to uphold an agreement. *See, e.g.*, *Plante*, 168 F.3d 1279 (disallowing taxpayer to treat payment to a corporation as a loan when unambiguous stock-purchase agreement stated taxpayer elected to make a capital contribution, absent a showing of *Danielson* evidence); *Bradley*, 730 F.2d 718 (prohibiting taxpayers from characterizing funds received from the sale of real property as payments on a continuing option rather than taxable interest income); *Spector*, 641 F.2d at 386 (recognizing taxpayer may challenge the form of his own transaction only upon presenting "proof of mistake, fraud, undue influence or any other ground that, in an action between the parties to the agreement, would be sufficient to set it aside or alter its construction"). Taxpayers lose under the *Danielson* rule, when they "fail[] to submit any evidence to prove the existence of a mistake, undue influence, fraud, or duress so as to merit release from the transaction form that they employed." *Bradley*, 730 F.2d at 720. The Petersons have presented no proof of mistake, undue influence, fraud, or duress that would release Peterson from her Family Program and Futures Program Agreements with Mary Kay.

*Co.*, 417 U.S. 134, 149, 94 S. Ct. 2129, 2137 (1974) ("This Court has observed repeatedly that, while a taxpayer is free to organize his affairs as he chooses, nevertheless, once having done so, he must accept the tax consequences of his choice, whether contemplated or not, and may not enjoy the benefit of some other route he might have chosen to follow but did not." (citations omitted)).[31]

The Tax Court applied the *Danielson* rule and determined Peterson's 2009 distributions from the Family Program and Futures Program were "subject to self-employment tax pursuant to section 1401," because the Petersons had "failed to adduce proof sufficient to alter the construction of these unambiguous agreements or show that they were unenforceable." *Peterson*, 106 T.C.M. (CCH) 619, \*3 (citing *Plante*, 168 F.3d at 1280-81; *Danielson*, 378 F.2d at 775). The Petersons do not dispute the Amendments to the Program Agreements unambiguously characterize Peterson's post-retirement payments as deferred compensation. The

---

[31] The dissent represents the purposes of the *Danielson* rule are (1) to preclude unjust enrichment, including the economic realities of a party's unilateral, ex post facto altering the tax consequences of an agreement and (2) to prevent the Commissioner from having to engage in unnecessary "whipsaw" litigation. Unfair enrichment, involving economic realities, is inapplicable to this case. Because Mary Kay had to comply with newly applicable Section 409A of the Internal Revenue Code in 2008, this instead is a case of regulatory compliance. The IRS can be "whipsawed" when it must "litigat[e] against two parties . . . to collect tax from only one party." *Plante*, 168 F.3d at 1281. Because the IRS seeks tax from the Petersons solely, its being "whipsawed" is not an issue in this case. "[W]here parties enter into an agreement with a clear understanding of its substance and content, they cannot be heard to say later that they overlooked possible tax consequences." *Danielson*, 378 F.2d at 778 (citation and internal quotation marks omitted).

41

undisputed lack of ambiguity in the terms of the Program Agreements necessarily precludes the Petersons from "adducing proof which in an action between the parties would be admissible to alter that construction." *Plante*, 168 F.3d at 1280-81. When a contract is unambiguous, Texas law holds the parties' intent must be determined from the contract terms alone. *Friendswood Dev. Co. v. McDade & Co.*, 926 S.W.2d 280, 283 (Tex. 1996); *see also Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 662 (Tex. 2005) (recognizing, under Texas law, a written contract must be construed in accordance with "the true intentions of the parties as expressed in the instrument").[32] Therefore, the *Danielson* rule requires that the Petersons are bound by the characterization of her 2009 Mary Kay, post-retirement Program payments as deferred compensation, making them subject to self-employment tax.

## B. Petersons' Arguments

Throughout this litigation, the Petersons have argued her 2009 Family Program and Futures Program payments constituted consideration for Peterson's ending her Mary Kay businesses and her agreement not to compete with Mary Kay

---

[32] The NSD, Family Program, and Futures Program Agreements each provide Texas law controls interpretation of the contract terms.

post-retirement.[33]  In essence, they represent it to be a sale of her domestic and

foreign businesses to Mary Kay.  Based on this premise, the Petersons contend her

retirement Program payments did not derive from her previous Mary Kay business

and were not deferred compensation in substance, subject to self-employment tax.

These arguments are belied by the NSD, Family Program, and Futures

Program Agreements as well as the record in this case.  There are no sales

agreements to evidence a sale of Peterson's domestic and foreign businesses to

Mary Kay.[34]  "A sale" is defined as "a transfer of property for a fixed price in

---

[33] The Petersons specifically make this representation in their initial and reply briefs: "THE
PROGRAM PAYMENTS RECEIVED BY CHRISTINE PETERSON FROM MARY KAY IN
TAX YEAR 2009 ARE NOT SUBJECT TO SELF-EMPLOYMENT TAX WHEN THE
PAYMENTS . . . CONSTITUTED CONSIDERATION FOR PETERSON'S CESSATION OF
HER BUSINESS AND AGREEMENT NOT TO COMPETE."  Appellants' Br. at 15;
Appellants' Reply Br. at 4 (same).

[34] Amici, 27 retired Mary Kay NSDs receiving Family Program and Futures Program payments
like Peterson, make the same argument that the noncompetition covenant is consideration for
payments under the Family Program and Futures Program for ending their Mary Kay businesses:

> [U]nder the [Family and Futures] Programs' agreements, each NSD expressly
> promised, in exchange for receiving payments, not to compete with Mary Kay and
> not to solicit any member of the Mary Kay sales force.  *The agreements also
> explicitly state that the Program Payments represent consideration for Mary
> Kay's acquisition, at retirement, of the valuable goodwill and other rights
> associated with the retiring NSD's business.  Each NSD's business comprises a
> highly developed network of beauty consultants and sales directors, the purchase
> of which benefited Mary Kay by providing numerous customers and millions of
> dollars in sales, revenue, and ultimately profit.*

Br. of Amicus Curiae Play Shortstop LLC in Support of Appellants at 7 (emphasis added).  Like
the Petersons, amici lift the noncompetition covenant from multiple pages of requirements in the
Family Program and Futures Program Agreements purportedly to establish consideration for the
sale of an NSD's business on retirement, which the dissent adopts.  Amici fail to recognize Mary
Kay NSDs are not required to retire at 65.  They voluntarily participated in the retirement

43

money or its equivalent." *Iowa v. McFarland*, 110 U.S. 471, 478, 4 S. Ct. 210, 214 (1884).  Nothing in the subject Agreements contains an express sales agreement or evidence of vendible business assets.[35]  On the facts of this record, the subject noncompetition agreements, which the Petersons assert are consideration for the sale of Peterson's businesses to Mary Kay, were not determinative in Peterson's receiving her post-retirement commissions from her domestic and foreign networks she had trained, when she was an active NSD for Mary Kay.

The Petersons' argument that the Family Program and Futures Program payments are not derived from Peterson's prior Mary Kay business also is

Programs, because the Family Program and Futures Program provide them a lucrative income stream in retirement, which augments their highly financially successful, active Mary Kay years. The amicus curiae brief was authored in part by the Petersons' counsel. *Id.* at 3.

[35] When the sale-of-business argument was made in the context of an insurance salesman's receipt of extended payments after terminating his business relationship with several insurance companies, the Tenth Circuit reviewed the agreements with the insurance companies and found no evidence of a sale of his business.  *Schelble v. Comm'r*, 130 F.3d 1388, 1394-95 (10th Cir. 1997).  That court concluded:

> The Agreement does not refer to a seller, buyer or specific property to be sold. . . . This [Agreement] language does not in any way refer to a sale.  The Agreement does not refer to a definite purchase price nor does it provide a basis of allocation of payments to a purchase price of assets.  There is no indication the parties intended to treat the payments as a sale of an asset.

*Id.* at 1395.  Consequently, the Tenth Circuit determined the insurance salesman's after-termination-of-employment, extended payments "were not proceeds from the sale of goodwill," were subject to self-employment tax, and affirmed the Tax Court.  *Id.*  But the dissent believes Peterson's Futures Program payments derive from the non-competition agreement in the Futures Program Agreement.  This is despite the fact that the revenue being generated by Peterson's foreign selling network is the result of her recruiting, training, supervising, and motivating them before her retirement.

undermined by the respective Agreements.[36]  The Family Program Agreement

delineates the commission percentages Peterson would derive in retirement from

her network.  This is the network of BCs, SDs, and NSDs Peterson recruited and

trained to sell Mary Kay products, which they would continue to sell.  Under her

NSD Agreement, Peterson received stated percentages of her network's sales

before she retired.  The reason she entered into the optional Family Program was

so she could continue to receive stated percentages of her network's sales, which

derived from her recruiting and training her network sellers prior to her retirement.

Peterson could have continued working as an NSD and received the percentages of

sales from her network under her NSD Agreement, which did not require her to

retire at 65.  When she executed the Family Program Agreement, however, she

committed to retirement at 65 and limited her receipt of percentages of sales

commissions from her network to 15 years, at which time she will be 80.[37]

---

[36] After an NSD retires, the selling skills she has taught her network determine the commissions both she and her network will receive.  This is the relation and derivation of the NSD's prior work, which establishes a productive selling network for Mary Kay.  Through the Family Program and Futures Program, Mary Kay provides a continuum of taxable commission payments for an NSD into retirement.  Therefore, NSDs are not fully compensated before they retire as long as they receive taxable network-commission income derived from the sales skills they have taught their network sellers.

[37] In Peterson's case, the valuable advantage of the Family Program was that it guaranteed 15 years of percentages of commissions from her NSD network after she turned 65.  Without the Family Program, if Peterson were to become disabled or die, she or her family would be unable to continue receiving her percentages of commissions from her network prior to her becoming 80.

The Futures Program provided NSDs incentive to develop a sales network in other countries, which afforded Mary Kay expansion into foreign markets through the leadership and training of its best, experienced producers. As a relatively recent retirement program, the Futures Program provided the retired NSD considerably less income after retirement than the domestic Family Program commissions.[38] Nonetheless, it provided additional retirement, network-commission income to a retired NSD for 12 years by augmenting percentage commissions from the foreign network the NSD had recruited and trained, like her domestic network under the Family Program. The percentage of foreign-network-commission income was derived from the NSD's work in other countries pre-retirement.[39] Payments with the same character as prior commissions constitute income derived from a petitioner's self-employment. *Erickson v. Comm'r*, 64 T.C. M. (CCH) 963, *6 (1992).

---

[38] The Mary Kay foreign networks produced less income than the domestic networks, because there were fewer of them, and they had not been in existence long enough to produce the sales-commission income of the domestic networks.

[39] Peterson recruited, trained, supervised, and coordinated a foreign sales network of some 23,000 sellers from whom she received substantial taxable percentage-commission income. Her foreign network continued to sell Mary Kay products and produce income for Mary Kay, themselves, and Peterson, based on the selling skills she had taught them, after her retirement. This foreign sales income would not exist for Mary Kay, the foreign sales network, or Peterson were it not for the investment of her time and energies to recruit and teach Mary Kay products and selling skills to the foreign network sellers. To say the Mary Kay sales Peterson's foreign sales network produced after her retirement was not "derived from" her efforts is to deny reality.

Despite the Petersons' references to the clarification in the characterization

of the Family Program and Futures Program commission income under a

nonqualified plan as deferred compensation for tax purposes under the 2008

Amendments one month before Peterson retired in January 2009, no factual or

legal issue has been created.  When she signed the Family Program and Futures

Program Agreements, Peterson was notified Mary Kay could make changes to the

Programs at any time.  She also was given the requisite notice of the effective date,

two months, by a  Mary Kay letter dated September 26, 2008.  Smoot, who handles

United States tax matters for Mary Kay, testified Peterson did not object after

receiving the letter informing her of this Amendment to the retirement Programs.

The fact this Amendment coincidentally became effective on December 1, 2008, is

inconsequential.[40]  The Amendment was noticed and effected in accordance with

---

[40] To the extent the dissent states or implies Mary Kay's notification to NSDs participating in the Family Program and Futures Program the characterization of Program payments for tax purposes was directed at Peterson, who retired in January 2009, there is no support in the record.  In accordance with the Family and Futures Program Agreements, Nathan P. Moore, Mary Kay General Counsel, notified all NSDs participating in the retirement Programs by a September 26, 2008, letter that Mary Kay had adopted Amendment No. 1 to the Family Program and Futures Program to clarify the Programs complied with Section 409A of the Internal Revenue Code, effective December 1, 2008, as required by the IRS for *all* corporate retirement plans.  Moore's notification letter to NSDs explains the Family Program and Futures Program had been operated with the intent of complying with the official IRS characterization since January 2005.  Nan Smoot, Mary Kay Director of United States Taxes, testified in Tax Court that, because the IRS 409A rules had gone through the procedural process involving several proposals, a comment period, and revisions, affected plans were not required to comply until 2008.

Therefore, Mary Kay simply notified NSD Program participants it officially was required to comply with the characterization by the IRS in 2008 for *its* tax reporting of Family Program and Futures Program payments to retired NSDs.  The fact Peterson retired one month later was purely coincidental.  Since her employment with Mary Kay, Peterson had been classified for *her*

47

the Family Program and Futures Program Agreements Peterson had executed with

Mary Kay.

The Petersons and amici argue against subjecting their retirement payments

under the Family Program and Futures Program to self-employment tax.[41]  They

primarily rely on two nonbinding circuit cases involving insurance salesmen,

whose payments after terminating their relationships with their insurance

companies were found not to be subject to self-employment tax.  *Gump v. United*

*States*, 86 F.3d 1126 (Fed. Cir. 1996);  *Milligan v. Comm'r*, 38 F.3d 1094 (9th Cir.

---

tax reporting as a self-employed individual.  It is hard to imagine a more ambitious, savvy and sophisticated business person than Peterson, who made geographic moves to progress rapidly through the Mary Kay ranks from BC to become a top NSD earner.  She and her husband had employed a financial planner, who testified at the tax trial, to advise them on how to best invest and utilize her earnings for tax purposes.  How she decided to invest and shelter her earnings was entirely her choice, but it was *her tax reporting* of her considerable income from the retirement Program payments that was not acceptable to the IRS. Importantly, Mary Kay's notification to NSDs participating in the retirement Programs was to inform them of the consequences of Mary Kay's IRS requirement to characterize retirement Program payments as deferred compensation under a nonqualified compensation plan so they could file their taxes accordingly to avoid incurring interest and a 20 percent penalty.  Implementing this tax characterization in 2008 by Mary Kay was an IRS requirement.

[41] Amici represent approximately 250 Mary Kay, retired NSDs currently receiving payments from the Family Program and Futures Program; that number increases annually with about 20 NSDs retiring each year.  Br. of Amicus Curiae at 1.  Therefore, amici join the Petersons in representing our decision on self-employment tax for payments from the Family Program and Futures Program will affect an increasing number of retired Mary Kay NSDs.  But they fail to recognize that characterizing their retirement-commission payments as nonqualified deferred compensation subject to self-employment tax *benefits them by preventing interest and a 20 percent penalty on Family Program and Futures Program payments, if the self-employment tax is not paid*.  They apparently want to avoid self-employment taxes on these retirement benefits by crafting an accounting, reporting method to recharacterize them, as the Petersons did.  This is not permissible under the governing tax law.

48

1994). [42] *But see Schelble v. Comm'r*, 130 F.3d 1388 (10th Cir. 1997) (concluding

insurance salesman's after-termination-of-employment payments were subject to

self-employment tax).  We distinguish these insurance cases on at least four bases.

First, their products are different.  Insurance policies, whether they are for life,

automobiles, fire and casualty, or general coverage involve contracts with a

customer for a specific time period; they have to be renewed, when that term

expires.  That is not the case with fungible cosmetic sales, which do not involve

---

[42] In 1997, Congress amended 26 U.S.C. § 1402 by adding subsection (k) for the specific purpose of "codif[ying] the standard established in *Milligan* with respect to termination payments made . . . to an 'insurance salesman.'"  *Farnsworth v. Comm'r*, 83 T.C.M. (CCH) 1153, 1159 & n.5 (2002) (citing H.R. Rep. No. 105-220, at 458 (1997) (Conf. Rep.)).  As codified in § 1402(k), the *Milligan* standard holds that self-employment tax does not apply to post-termination payments from an insurance company to its former insurance salesman, provided four requirements inapplicable to this case are satisfied.  *See* 26 U.S.C. § 1402(k)(2), § 1402(k)(3), 1402(k)(4)(A), § 1402(k)(4)(B).  The Petersons concede § 1402(k) was intended to codify the *Milligan* standard, *which unambiguously applies only to contractual termination payments to former insurance agents*.  Appellants' Br. at 19-20.  By urging the application of *Milligan* in this case, the Petersons and amici invite this court to expand § 1402(k) beyond the confines of its text.  Appellants' Br. at 20; Amicus Curiae Br. at 9.  If Congress had intended the *Milligan* standard to be applied outside the context of termination payments to insurance salesmen, it would have so stated.  Instead, it unambiguously limited the standard to the context of termination payments to former insurance agents.

In addition, the legislative history of § 1402(k) states "[n]o inference is intended with respect to the [self-employment] tax treatment of payments that are not described in [§ 1402(k)]."  H.R. Rep. No. 105-220, at 458 (1997) (Conf. Rep.), *reprinted in* 1997-4 (Vol. 2) C.B. 1457, 1928; *see Ruckelshaus v. Sierra Club*, 463 U.S. 680, 686 n. 8, 103 S. Ct. 3274, 3278 n.8 (1983) ("If Congress had intended the far-reaching result urged by respondents, it plainly would have said so, as is demonstrated by Congress' careful statement that a *less* sweeping invitation *was* adopted.").  Moreover, if *Milligan* accurately reflected the generally applicable "derived from" standard under § 1402(a), then § 1402(k) would be superfluous.  *See, e.g., Nunnally v. Equifax Info. Servs., LLC*, 451 F.3d 768, 773 (11th Cir. 2006) ("It is a cardinal principle of statutory construction that 'a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.'" (citation omitted)). We decline to expand § 1402(k) beyond its text, as the Petersons and amici urge.  The dissent, however, ignores this legislative history and case law clearly limiting *Milligan* to insurance salesmen.

49

contracts with customers or renewals.  Second, the calculation of after-termination-of-business payments for insurance salesmen is based on methods and concepts, such as renewals, adjustments, and deductions, which are germane to the insurance business.  Third, while insurance salesmen and Mary Kay NSDs are independent contractors, their means of operation are entirely different.  Insurance salesmen work singularly; the commissions they garner are the result of each salesman's individual work.  In contrast, Mary Kay NSDs no longer are selling cosmetics but lead and train their ever increasing networks, whose sales generate the NSDs' commissions *before and after their retirement*, which meet the requirement under a nonqualified plan for deferred compensation, derived from previous work as an independent contractor.  Fourth and most distinctive, the Mary Kay Family Program, for percentages of commissions from NSDs' domestic networks, and Futures Program, for percentages of commissions from their foreign networks, are one of a kind.  As Jill Wedding, Mary Kay Director of Consultant Marketing, testified at the Tax Court trial, the Family Program and Futures Program are "unique" concerning after-retirement programs for direct-sales companies.[43]  For these reasons, we do not consider the after-termination payments of insurance

---

[43] We do not have the insurance agreements to determine if those provisions or the quantity/quality test used in the insurance business has any genuine relevance to Mary Kay's unique product-sales operation.  The obvious differences, however, are notable.  For example, the insurance cases, on which the dissent relies, do not involve sales networks in foreign countries.

50

salesmen to be comparable to the Mary Kay Family Program and Futures Program for the purpose of determining whether commission payments received by NSDs in retirement are subject to self-employment tax as deferred compensation under a nonqualified plan. The Petersons "failed to establish that [Peterson] qualified for an exemption to the [self-employment] tax" imposed on her 2009 deferred payments for the Family Program and Futures Program. *Patterson*, 740 F.2d at 929.

On the facts of this case and controlling law, we hold the percentage commissions received by Peterson, a retired NSD, under the Family Program and Futures Program are subject to self-employment tax, because they are classified specifically as deferred compensation, derived from her prior association with Mary Kay. Because the Petersons did not pay the self-employment tax Peterson owed for her 2009 commission payments from the Family Program and Futures Program, "the tax court did not err in upholding the additional tax imposed by the IRS," including interest and penalties. *Id.* at 930. The appeal from the decision of the Tax Court upholding Peterson's self-employment tax for 2009, our Appeal No. 14-15774, is AFFIRMED. The consolidated appeal from the decision of the Tax Court relating to tax years 2006 and 2007, our Appeal No. 14-15773, is DISMISSED as improperly filed.

51

**AFFIRMED IN PART, DISMISSED IN PART.**

ROSENBAUM, Circuit Judge, dissenting in part and concurring in the judgment in part:

To be taxable as self-employment income, an individual's income must be (1) derived, (2) from a trade or business, (3) carried on by that individual. *See* 26 U.S.C. § 1402(a)-(b). Here the parties agree that the payments Christine Peterson received under Mary Kay's Family Security Program and Great Futures Program (collectively, the "Programs") are related in some way to the Mary Kay business formerly carried on by Peterson. The only issue is whether the payments "derive" from that business.

The Majority holds that they do based on the "*Danielson* rule." Maj. Op. at pp. 36-41. That judge-made rule permits the Commissioner of the Internal Revenue Service to bind a taxpayer to her initial characterization of the form of a transaction. *See generally Comm'r v. Danielson*, 378 F.2d 771 (3d Cir. 1967) (en banc); *see also Plante v. Comm'r*, 168 F.3d 1279, 1280 (11th Cir. 1999). The Majority asserts that, by operation of the agreements Peterson executed to enroll in the Programs, she consented to Mary Kay's characterization of Program payments as "deferred compensation." According to the Majority, she is therefore prohibited from challenging that characterization by the *Danielson* rule. Because it is well-established that "deferred compensation" derives from a taxpayer's prior labor and is subject to the self-employment tax, the Majority concludes that Peterson must

53

pay the self-employment tax on the program payments.

Peterson, however, never *characterized* the payments as deferred compensation.  Instead, the agreements Peterson executed to enter Mary Kay's programs empowered Mary Kay to make unilateral amendments to the Programs.  Years after Peterson and Mary Kay entered into the agreements, Mary Kay invoked that power to unilaterally characterize payments made under the Programs as "deferred compensation."  The *Danielson* rule has never been applied on facts like these.  Nor should it be.  Accordingly, I cannot agree with the Majority opinion's application of the *Danielson* rule here and respectfully dissent from that portion of the opinion.

Because I would hold that the *Danielson* rule is inapplicable here, I would apply the well-established *Newberry* test to determine whether there is a "nexus" between the payments Peterson received under the Programs and her Mary Kay business.  *Newberry v. Comm'r*, 76 T.C. 441, 444 (1981).  Such a nexus exists between the Family Security Program payments and Peterson's work as a Mary Kay National Sales Director, so I concur in the Majority's judgment holding that the self-employment tax is applicable to these payments.  On the other hand, there is no such nexus between the payments made under the Great Futures Program and Peterson's Mary Kay labor, so I would hold that the self-employment tax is

inapplicable to those payments, and I therefore respectfully dissent from the Majority's judgment to the contrary.

## I.

The parties agree that if the payments made to Peterson pursuant to the Family Security Program ("Family Program") or Great Futures Program ("Futures Program") "derived" from her work as a Mary Kay National Sales Director ("NSD"), they are subject to the self-employment tax. *See* 26 U.S.C. § 1402(a)-(b); *Milligan v. Comm'r*, 38 F.3d 1094, 1097 (9th Cir. 1994). It is likewise well-accepted, and again the parties agree, that "deferred compensation" necessarily "derives from" a trade or business within the meaning of § 1402(a)-(b). *See Jackson v. Comm'r*, 108 T.C. 130, 137-38 (1997) (holding that payments were not subject to self-employment tax because they were not deferred compensation); *Milligan*, 38 F.3d at 1099 (9th Cir. 1994) (same). The parties therefore agree that if the Family Program and the Futures Program payments are deferred compensation, they are subject to the self-employment tax. But the parties dispute whether Program Payments are, in fact, deferred compensation.

## A.

The Majority sides with the Commissioner of the Internal Revenue Service ("Commissioner" or "IRS") and holds that the payments are "deferred compensation" under the *Danielson* rule. The *Danielson* rule permits the

Commissioner of the IRS to bind a taxpayer to the tax consequences of her agreement, as construed by the Commissioner, unless the taxpayer "adduc[es] proof which in an action between the parties to the agreement would be admissible to alter that construction or to show its unenforceability because of mistake, undue influence, fraud, duress, etc." *Danielson*, 378 F.2d at 775.

In *Danielson*, the stockholders of Butler County Loan Company ("Butler") decided to sell the company to Thrift Investment Corporation ("Thrift") for $374 per share. 378 F.2d at 773. Thrift drafted the sales agreement and allocated $222 per share to the contract for the sale of stock and $152 per share to a covenant not to compete because the allocation to the covenant provided favorable tax consequences for Thrift. *Id.* After signing the sales agreement and receiving the funds, each of the Butler stockholders reported the entire sum he or she received as capital gains. *Id.* at 773-74. The Commissioner issued a notice of deficiency with respect to the sum attributable to the covenant not to compete. *Id.* at 774.

In the Commissioner's view, that portion of the payment was taxable as ordinary income, that is, at a higher rate than capital gains. *Id.* at 774. Upon the stockholders' petitioning for a redetermination of the deficiency, the Tax Court ruled in favor of the stockholders, holding that "the covenants were not realistically bargained for by the parties and that the amounts allocated thereto by Thrift were

56

in reality that part of the purchase price of the stock which represented a premium on corporate receivables." *Id.*

The Commissioner appealed the decision. *Id.* On appeal, the Third Circuit formulated the *Danielson* rule and reversed the Tax Court, holding that the taxpayers could not escape the tax consequences of the sales agreement's explicit allocation of $152 per share to the covenant not to compete. *Id.* at 774-79.

We've adopted the *Danielson* rule and applied it in factually similar situations to the one found in *Danielson*. *See Plante*, 168 F.3d at 1280-81 (applying *Danielson* rule to hold a taxpayer to a Stock Purchase agreement's designation of a sum as a "capital contribution"); *Spector v. Comm'r*, 641 F.2d 376, 383-86 (5th Cir. Unit A Apr. 1981) (applying *Danielson* rule to conclude that a buy-out agreement carefully and intentionally structured as a liquidation was a "liquidation," as opposed to "sale" subject to capital-gains tax).[1] We've also added our own gloss to the rule, explaining that "[w]hen a taxpayer characterizes a transaction in a certain form, the Commissioner may bind the taxpayer to that form for tax purposes." *Plante*, 168 F.3d at 1280.

Here, the Majority asserts that Peterson is bound by the *Danielson* rule because she "consented" to the characterization of Program Payments as "deferred

---

[1] Pursuant to *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), opinions of the Fifth Circuit issued prior to October 1, 1981, are binding precedent in the Eleventh Circuit.

compensation." Maj Op. at 36-41; *see also id.* at 39 n.29. But Peterson never consented to Mary Kay's characterization in such a way that she could herself be said to have characterized the Program payments in the *Danielson* sense.

Instead, Peterson entered into agreements to enroll in the Family Program in 1992 and the Futures Program in 2005, both of which contained provisions permitting Mary Kay to later unilaterally "amend, modify or terminate" the Programs "at any time and in any manner."

Years later, Mary Kay exercised that authority by "amending" the agreements to characterize the Program payments as "a non-qualified deferred compensation arrangement" intended to meet the requirements of a non-qualified compensation plan under Section 409A of the I.R.C.[2] According to the Majority,

---

[2] The amendments became effective December 1, 2008, one month before Peterson retired, approximately sixteen years *after* Peterson executed the Family Program agreement, and three years *after* she executed the Futures Program agreement. In relevant part, the 2008 Amendments read,

"Section 10.9 is added to specifically reflect compliance with Section 409(A) of the Internal Revenue Code:"

> Internal Revenue Code Status. The Program [Plan] is intended to be a non-qualified deferred compensation arrangement and is not intended to meet the requirements of Section 401(a) of the Code. The Program [Plan] is intended to meet the requirements of Section 409A of the Code and shall be construed and interpreted in accordance with such intent. No person connected with the Program [Plan] in any capacity, including but not limited to [Mary Kay] and any affiliates of [Mary Kay] and their respective directors, officers, agents and employees, makes any representation, commitment or guarantee that any tax treatment, including but not limited to federal, state and local income, estate, and gift tax treatment, will be applicable with respect to any amounts deferred or payable under the Program [Plan] or that such tax treatment will apply to or be available to a Participant on account of participation in the Program [Plan].[2]

58

Peterson "consented" to Mary Kay's unilateral characterization of Program payments as "deferred compensation" in the sense that she had previously consented to Mary Kay's authority to unilaterally amend the Programs. The Commissioner argues, and the Majority agrees, that Peterson is therefore prohibited from challenging the "deferred compensation" characterization by the *Danielson* rule.

I respectfully disagree. To be clear, I do not, as the Majority suggests, dispute that Peterson consented to Mary Kay's amendment of the Agreements to include the language in the 2008 Amendments as a matter of contract law. *See* Maj. Op. at 39 n.29. Rather, I take issue with the Majority's second-order conclusion that Peterson's consent to unilateral amendments *to the Programs* somehow permitted Mary Kay to bind Peterson to its post-hoc characterization of the Program payments for purposes of applying the judicially crafted *Danielson* rule. Indeed, the Amendments did not purport to amend the Programs substantively but instead to simply characterize the Programs as they existed before the Amendments.

As an initial matter, no court, to my knowledge, has applied the *Danielson* rule to bind a taxpayer to her counterparty's *ex post facto*, unilateral characterization of a transaction. Neither the Majority nor the Commissioner

---

Mary Kay Amend. No. 1 § 10.9, Family Program & Futures Program.

points to any such authority.  Instead, the cases applying the *Danielson* rule have done so where the taxpayer herself either (1) executed a document at the time of the transaction explicitly characterizing a transaction in a particular form;[3] or (2) intentionally structured a transaction in a particular form for tax purposes.[4]  Indeed, one of our sister circuits has held that the *Danielson* rule *cannot* be "meaningfully applied" in cases where the transacting parties did not mutually and specifically agree to a particular term in a contract.  *See Patterson v. Comm'r*, 810 F.2d 562, 572 (6th Cir. 1987).  In sum, I have not been able to find any direct support, in this Circuit or anywhere else, for the Majority's application of the *Danielson* rule to bind Peterson to Mary Kay's post-consummation, unilateral characterization of the Program agreements.

Nor should the *Danielson* rule apply in this case.  The *Danielson* rule serves two purposes, neither of which is vindicated by the Majority's decision.  First, the rule seeks to prevent a party from unjustly enriching itself by unilaterally altering

---

[3] S*ee, e.g.*, *Plante*, 168 F.3d at 1281 (applying the *Danielson* rule where taxpayer executed stock purchase agreement explicitly characterizing a sum as a "capital contribution"); *Bradley v. United States*, 730 F.2d 718, 720 (11th Cir. 1984) (applying the *Danielson* rule where taxpayer executed a sale agreement and later attempted to argue that the transaction was not "sale" but an "option" agreement); *Danielson*, 378 F.2d at 771 (taxpayers signed sales agreement explicitly allocating portions of the proceeds of a sale to a covenant not to compete).

[4] *See, Spector*, 641 F.2d at 383-86 (*Danielson* rule precluded a taxpayer from arguing that a transaction was a "sale" where the taxpayer intentionally structured the transaction as a "liquidation" for tax purposes).

the intended tax consequences of a transaction after consummation.  *See*

*Danielson*, 378 F.2d at 775.  The *Danielson* Court explained as follows:

> [T]o permit a party to an agreement . . . to attack [a]
> provision for tax purposes, absent proof of the type
> which would negate it in an action between the parties,
> would be in effect to grant, at the instance of a party, a
> unilateral reformation of the contract with a resulting
> unjust enrichment.  If allowed, such an attach [sic] would
> encourage parties unjustifiably to risk litigation after
> consummation of a transaction in order to avoid the tax
> consequences of their agreements.  And to go behind the
> agreement at the behest of a party may also permit a
> party to an admittedly valid agreement to use the tax laws
> to obtain relief from an unfavorable agreement.
>
> Of vital importance, such attacks would nullify the
> reasonably predictable tax consequences of the
> agreement to the other party thereto.  Here the buyer
> would be forced to defend the agreement in order to
> amortize the amount allocated to the covenant. If
> unsuccessful, the buyer would lose a tax advantage it had
> paid the selling-taxpayers to acquire. In the future buyers
> would be unwilling to pay sellers for tax savings so
> unlikely to materialize.

*Id.*  Thus, the first purpose of permitting the Commissioner to bind a taxpayer to

the form in which she initially characterized a transaction is to prevent unilateral,

*ex post facto* contract revisions.  As a result, the rule discourages parties from

risking litigation by attempting to unilaterally reform their agreements post-

consummation, and it ensures that future parties can reliably allocate the tax

consequences of their transactions.

61

The *Danielson* rule also serves as a prophylactic to prevent the Commissioner from pursuing unnecessary "whipsaw" litigation. *See id.* at 775; *Plante*, 168 F.3d at 1281. If two taxpayers adopt divergent characterizations of the proceeds of a single transaction, the Commissioner faces the possibility of "los[ing] out on revenue that logically should have come from one of the parties." *N. Am. Rayon Corp. v. Comm'r*, 12 F.3d 583, 587 (6th Cir. 1993). In these instances, the Commissioner is "confronted with the necessity for litigation against both buyer and seller in order to collect taxes properly due." *Danielson*, 378 F.2d at 775. So we've explained that the second purpose of binding taxpayers to their characterizations of their transactions under the *Danielson* rule "is to prevent the IRS from being 'whipsawed': litigating against two parties . . . to collect tax from only one party." *Plante*, 168 F3d at 1281.

Applying the rule here stands the first purpose for which the rule was formulated on its head. Peterson, the taxpayer, made no attempt to alter the express terms of the transaction that she and Mary Kay agreed to at formation; she merely seeks review and enforcement of the terms of the Programs themselves. Only Mary Kay has arguably attempted to alter the tax consequences flowing from the substantive terms of the Programs to which the parties agreed.

In these circumstances, applying the *Danielson* rule does not *prevent* a unilateral, post-consummation contract reformation. Instead, the Majority's

application of the rule *insulates* Mary Kay's unilateral, *ex post facto* characterization of the Program payments from meaningful review. As a result, today's decision encourages parties to risk litigation by attempting unilateral, post-consummation contract reformations to avoid the tax consequences of their transactions. Another result of today's decision is that parties will be less certain about the tax consequences of a transaction where the agreement contains a unilateral amendment provision—whichever party has the power to amend the agreement will be able to alter those consequences by simply re-characterizing the transaction after consummation.

As a result, the Majority's application of the *Danielson* rule here conflicts with the first purpose the rule was meant to serve. *See Danielson*, 378 F.2d at 775. The only way for us to vindicate the first purpose of the *Danielson* rule in cases like this one is to set aside the *Danielson* rule and look through to the economic realities of the transaction.[5]

---

[5] Responding to this point, the Majority contends that this case does not implicate the first purpose of the *Danielson* rule—preventing parties from unjustly enriching themselves by preventing them from re-characterizing transactions *ex post facto*—because *Mary Kay* did not seek to unjustly enrich itself. Maj. Op. at 41 n.31. As an initial matter, I respectfully suggest that the Majority's conclusion that the first purpose of the *Danielson* rule is not implicated in this case, whatever the reasoning, counsels against applying the *Danielson* rule at all. But in any event, the Majority does not focus on the right party. The Commissioner here is trying to collect taxes from Peterson, not Mary Kay. Thus, the *Danielson* concern here is whether Peterson, not Mary Kay, is attempting to unjustly enrich herself. In other words, the purpose of applying the *Danielson* rule in this case would be to ensure that Peterson does not unfairly shift tax liability to Mary Kay via a post-hoc re-characterization of their transaction. I only suggest that applying the *Danielson* rule here might permit Mary Kay to unjustly enrich itself to underscore my broader

Nor does applying the *Danielson* rule in this case vindicate the rule's second purpose of preventing unnecessary whipsaw litigation. The *Danielson* rule was never intended to entirely eliminate the need for the Commissioner to *ever* pursue litigation against both parties to an agreement, as evidenced by the rule's own carve-out for cases where a taxpayer "adduc[es] proof which in an action between the parties to the agreement would be admissible to alter [the Commissioner's] construction or to show its unenforceability because of mistake, undue influence, fraud, duress, etc." *Danielson*, 378 F.2d at 775.

Instead, the rule eliminates the need for the Commissioner to pursue litigation against both parties in a very particular set of cases. Where a taxpayer initially agrees to an *express* contractual characterization or form and later attempts to re-characterize the term or form, the *Danielson* rule acts as a prophylactic to prevent the IRS from having to pursue the taxpayer's counterparty out of a concern that a court will agree with the taxpayer's *ex post facto* re-characterization. *See Plante*, 168 F.3d at 1281-82 (the *Danielson* rule prevents the IRS from having to pursue whipsaw litigation by preventing a party from "alter[ing] the *express* terms of his contract by arguing that the terms did not represent economic reality" (emphasis added)); *see also Patterson*, 810 F.2d at 572 ("The *Danielson* rule can

---

point that applying the *Danielson* rule in circumstances like these actually incentivizes parties to engage in the very post-hoc-tax-liability shifting the rule is meant to guard against.

64

only be meaningfully applied in those cases where a *specific* amount has been mutually allocated to the covenant as expressed in the contract." (emphasis added)).

The *Danielson* rule, however, has no application in cases where, as here, the taxpayer does not seek to avoid an express contractual term or form. *See Plante*, 168 F.3d at 1282; *Patterson*, 810 F.2d at 572. In these cases, the Commissioner must resort to litigating the tax deficiency on the merits and, if need be, "assert[ing] inconsistent positions and . . . assess[ing] deficiencies against more than one person for the same tax liability if there is an accepted legal basis for each assertion." *Gerardo v. Comm'r*, 552 F.2d 549, 555 (3d Cir. 1977). In other words, the Commissioner must go ahead and pursue whipsaw litigation. Indeed, the reason courts permit the Commissioner to pursue whipsaw litigation is to protect the public fisc from any whipsaw effect in cases where "there is an accepted legal basis" for asserting a single tax deficiency against multiple parties. *Id.*; *see also Bouterie v. Comm'r*, 36 F.3d 1361, 1374 (5th Cir. 1994) (holding that, when the IRS asserts a single tax deficiency against multiple parties, each assertion "must have a reasonable basis in fact and law"). In other words, courts permit the Commissioner to pursue whipsaw litigation precisely because sometimes, as here, more than one party is arguably liable for a single tax deficiency.

Here, Peterson never expressly agreed to a characterization of the Program payments as "deferred compensation" in the *Danielson* sense. Instead, as the Commissioner implicitly acknowledges, there is a reasonable legal basis to conclude that Program payments are either (1) deferred compensation, in which case Peterson is liable for the tax deficiency; or (2) payments for a covenant not to compete, in which case Mary Kay would be responsible for incorrectly deducting the payments on its tax returns. In these circumstances, I would hold that the Commissioner may not rely on the *Danielson* rule in lieu of pursuing actual whipsaw litigation to resolve a genuine dispute about whether Peterson or Mary Kay is responsible for the tax deficiency at issue. The Majority's contrary conclusion, in my opinion, does not vindicate the rule's prophylactic purpose of preventing *unnecessary* whipsaw litigation; it prevents necessary whipsaw litigation.[6]

---

[6] The Majority responds that "[b]ecause the IRS seeks tax[es] from the Petersons solely, its being 'whipsawed' is not an issue in this case." Maj. Op. at 39 n.29. If the anti-whipsaw concern underlying the *Danielson* rule is not implicated here, whatever the reasoning, that counsels against applying the *Danielson* rule at all. In any event, I respectfully disagree that this case presents no whipsaw concerns. "Whipsaw" is a concern whenever more than one party is arguably liable for a single tax deficiency—if each taxpayer contends that he or she is not liable for the deficiency, the IRS may be forced to pursue both parties in court to recover a single deficiency. Here, Peterson and Mary Kay have adopted divergent characterizations of the Program payments and, as I noted, the IRS has conceded that each could arguably be liable for the single tax deficiency depending on the appropriate characterization of the payments. Thus, a concern exists that the IRS could be whipsawed by Peterson and Mary Kay's divergent characterizations of the payments. My point is that the whipsaw concern here is materially different than the one the *Danielson* rule was crafted to address. The *Danielson* rule seeks to nip *unnecessary* whipsaw litigation in the bud by holding parties to their initial, agreed-upon characterization of transactions. In other words, the *Danielson* rule was designed to prevent

In sum, I could find no precedential support for the application of the *Danielson* rule in cases, such as this one, where a taxpayer did not expressly agree to a particular characterization or contractual form at the time of a transaction. Nor do the purposes of the *Danielson* rule support the expansion of the rule to cover such cases. For these reasons, I respectfully disagree with the Majority's application of the *Danielson* rule in this case and would hold that Peterson is not bound by Mary Kay's unilateral, *ex post facto* characterization of Program payments as "deferred compensation."[7]

---

parties from whipsawing the IRS by adopting divergent characterizations of transactions when they initially agreed to a particular characterization. Here, however, Peterson and Mary Kay never agreed to Mary Kay's "deferred compensation" characterization at the outset. Instead, Mary Kay unilaterally characterized the Program payments years after the transaction was consummated via the unilateral amendment provisions in the Program agreements. We should not apply the *Danielson* rule and permit the Commissioner to bind Peterson to Mary Kay's *ex post facto* re-characterization because Peterson is not attempting to pull a fast one on the IRS by backtracking on an initial, mutual characterization of the payments.

[7] The Majority contends that we are bound to apply the *Danielson* rule under *Spector v. Commissioner of Internal Revenue*, 641 F.2d 376, 383-86 (5th Cir. Unit A Apr. 1981), *Bradley v. United States*, 730 F.2d 718, 720 (11th Cir. 1984), and *Plante v. Commissioner of Internal Revenue*, 168 F.3d at 1280-81; and that any decision not to apply the *Danielson* rule would violate the prior-precedent rule. Maj. Op. at 40 n.30. In making this point, the Majority appears to misunderstand my argument, framing my argument as premised on the proposition that we need not apply prior precedent any time the facts of a new case are not identical to those of a prior case. *Id.* To be clear, that is not my position. Rather, my point is that the facts of *Spector*, *Bradley*, *Plante*, and every other case applying the *Danielson* rule, including *Danielson* itself, are not just different from the facts here, they are *materially* distinguishable: in each of those cases, the taxpayer herself either (1) executed a document at the time of the transaction explicitly characterizing a transaction in a particular form; or (2) intentionally structured a transaction in a particular form for tax purposes. *See supra* pp. 7-8. Here, Peterson did neither. And, as I described above, applying the *Danielson* rule on the facts of this case disserves the two purposes of the rule. Declining to apply the *Danielson* rule in this case, therefore, would not violate the prior-precedent rule. Instead, it would merely recognize that the *Danielson* rule has not been

**B.**

Just because the *Danielson* rule does not apply, however, does not necessarily mean that the payments are not "deferred compensation," and thus subject to the self-employment tax. Instead, when the *Danielson* rule is inapplicable, we look to the substance of the transaction to determine its nature. *See, e.g.*, *Plante*, 168 F.3d at 1280 (noting that, were the *Danielson* rule inapplicable, we would apply a 13-factor test to determine whether a sum is a loan or a capital contribution).

In *Jackson v. Commissioner*, 108 T.C. 130 (1997), the Tax Court summarized what a traditional deferred-compensation agreement looks like. It stated,

> In a typical deferred compensation arrangement, an employee wants to postpone receiving a portion of the income to which he or she is entitled with the understanding that the income will be paid at a later time, usually upon retirement or other termination. In these cases the employee chose to receive less than his or her agreed compensation when earned with the understanding that it would be paid out at some later time. The employer ordinarily contributes the amount designated by the employee to a fund established for that purpose.

*Id.* at 137 (internal citations omitted).

---

applied, and *should* not be applied, in the materially distinguishable situation where a taxpayer's counterparty *ex post facto* unilaterally characterizes a transaction to its benefit.

68

Our sister circuits have provided additional guidance on the deferred-compensation inquiry. For instance, in *Gump v. United States*, the Federal Circuit held that the extended earnings an insurance salesman received after retirement were not deferred compensation. 86 F.3d 1126, 1128-29 (Fed. Cir. 1996). The Federal Circuit rested its conclusion on the following facts: the salesman received all of the commissions he was entitled to prior to receiving the extended earnings; the extended earnings were "not derived by holding back a portion of [the salesman]'s salary"; and disbursement of the extended earnings was conditioned on the salesman's qualified cancellation of his insurance relationships such that he had no vested right to receive the extended earnings. *Id.* Likewise, in *Milligan v. Commissioner*, the Ninth Circuit held that payments made to a retired insurance salesman were not deferred compensation because "none of [the salesman]'s earnings were deferred, *i.e.*, he had no vested right to payment of an identifiable money amount." 38 F.3d 1094, 1099 (9th Cir. 1994).

Guided by *Jackson*, *Gump*, and *Milligan*, I would hold that the Program payments Peterson received were not "deferred compensation" for three reasons. *First*, Peterson was never asked to defer any portion of her income until a later date. *Second*, before Peterson's retirement, Mary Kay fully compensated Peterson for all of the commissions she was entitled to receive under her NSD agreement. *Third*, Peterson had no vested right to the Program payments. Instead, they were

69

conditioned on Peterson's compliance with *contemporaneous* and *future* obligations, more specifically, the covenant not to compete.  Additionally, as discussed above, both Program agreements contained a unilateral-amendment provision permitting Mary Kay to "amend, modify or terminate the Plans at any time and in any manner." I have found no constraint in the agreements prohibiting Mary Kay from reducing the Program payments at any time.

Distinguishing the insurance cases, the Majority suggests that the payments here would be deferred compensation even on the merits because, unlike insurance agents who work by themselves, NSDs "lead and train their ever increasing networks, whose sales generate the NSDs' commissions *before and after their retirement*." Maj. Op. at 47-48.  But in *Milligan*, the Ninth Circuit held that the extended earnings payments were not deferred compensation despite the fact that the employer could adjust the payments and "[t]he adjusted payment amount depended not upon Milligan's past business activity, but upon the successor agent's future business efforts to retain Milligan's customers." 38 F.3d at 1099.

Moreover, as the Majority recognizes, NSDs are compensated through commissions on their networks' sales. NSDs are not directly compensated for leading and training their networks.  Even if an NSD provided her network with top-notch training and leadership, she would still receive no compensation if the network did not sell any Mary Kay products.  Thus, payments based on

70

commissions generated after an NSD retires cannot be deferred compensation for prior leadership and training—NSDs like Peterson were never compensated for those responsibilities, before or after retirement.

Because the facts here are materially indistinguishable from those in *Jackson*, *Gump*, and *Milligan*, I would hold that Peterson's Program payments are not "deferred compensation," and thus not subject to the self-employment tax on this basis.

## II.

Even though I would conclude that the Program payments are not "deferred compensation," that would not conclusively establish that the Program payments are not subject to the self-employment tax. Other types of income may still be subject to the tax, so long as they "derive from a trade or business." *See* 26 U.S.C. § 1402(a)-(b). Income "derives from a trade or business" whenever there is "a nexus between the income received and a trade or business that is, or was, actually carried on." *Newberry v. Comm'r*, 76 T.C. 441, 444 (1981). Where income does not meet the nexus test but instead derives from a former employee's compliance with a covenant not to compete, it is not subject to the self-employment tax. *Milligan*, 38 F.3d at 1098 n.6.

Three of our sister circuits' decisions illuminate the nature of the *Newberry* nexus inquiry. First, in *Milligan*, the Ninth Circuit analyzed the nexus issue with

71

regard to "termination payments" made to Milligan, a retired insurance sales agent. 38 F.3d at 1098. Milligan and his employer entered into an agreement that provided for termination payments, the amount of which were based on a percentage of Milligan's outstanding policies in the twelve months preceding his retirement. *Id.* at 1096. Under the agreement, Milligan was eligible to receive termination payments for five years only if he had worked as an agent for at least two years, returned all employer-owned property, and refrained from competition with his employer for one year. *Id.*

On these facts, the Ninth Circuit held that the termination payments were not subject to the self-employment tax because they did not "derive" from Milligan's prior business activity. *Id*. at 1098. The Ninth Circuit reasoned, "To be taxable as self-employment income, earnings must be tied to the *quantity or quality* of the taxpayer's prior labor, rather than the mere fact that the taxpayer worked or works for the payor." *Id*. (emphasis added). As noted above, the Ninth Circuit first concluded that the payments were not deferred compensation. *Id.* at 1099.

Nor, the Ninth Circuit held, did the payments otherwise "derive" from Milligan's prior business activity. The *Milligan* Court observed that the only link between the quantity or quality of the agent's prior labor and the payments at issue was Milligan's status as a two-year-plus independent contractor. *Id.* That link on its own, the court held, was insufficient to satisfy the "derive" requirement. *Id.*

72

The Court explained that "[i]t is not enough that, had the taxpayer not performed certain services (that were fully compensated for)—not been an independent contractor, for example—the taxpayer never would have received the disputed payments." *Id.*

Notably, even though the amount of the payments *was* partially tied to Milligan's prior labor, the Ninth Circuit held that the termination payments were not tied to the quantity or quality of Milligan's prior labor because the amount of the payments was also subject to two adjustments that did not depend on Milligan's prior labor.

> At most, the amount of the Termination Payments, not the payments themselves, actually arose from Milligan's business activity. Milligan had a contingent right to receive an uncertain amount of money or nothing, depending upon the level of his prior business activity leading to compensation in his final year as an agent. The payment amount depended upon the level of his commissions . . . . on personally-produced policies, *i.e.*, his previous value as a[n] . . . insurance agent.
>
> However, in part, even the payment amount did not depend upon the level of Milligan's prior business activity because the Termination Payments were subject to two adjustments unrelated to any business activity on Milligan's part for [the employer]. The [employer] adjusted the Termination Payments to reflect the amount of income received on Milligan's book of business during the first post-termination year, and the number of his personally-produced policies cancelled during that year. If all of Milligan's customers had cancelled their . . . non-life policies during the first post-termination year, then Milligan would have received nothing. The adjusted

73

payment amount depended not upon Milligan's past business activity, but upon the successor agent's future business efforts to retain Milligan's customers and to generate service compensation for [the employer]. In this way too, the disputed Termination Payments did not "derive" from Milligan's prior services.

*Id.*

Similarly, in *Gump*, the Federal Circuit held that the monthly "extended earnings" payments Gump, a retired insurance agent, received from his former employer did not meet the *Newberry* nexus test and were therefore not subject to the self-employment tax. 86 F.3d at 1127. There, Gump was entitled to receive extended earnings if he worked for the employer for at least five years. *Id.* The extended-earnings payments were "calculated by reference to the agent's policy renewal fees for his last twelve months of service, subject to certain adjustments." *Id.* Like the *Milligan* Court, the Federal Circuit held that the extended-earnings payments were not "deferred compensation." *Id.* at 1128-29. In addition, the Federal Circuit relied on several significant facts to conclude that the extended earnings were not otherwise "derived" from the Gump's former business activity.

First, the right to receive extended earnings was conditioned upon the cessation of business activity; that is, cessation was "not just a condition that [had to] be observed to preserve [Gump's] *eligibility* for the [payments]; it [was] a precondition to receiving them." *Id*. at 1128. The court reasoned that the payments did not arise or derive from the trade or business, but more accurately

74

derived from the *cancellation* of that trade or business. *Id.* Thus, the fact that the payments, in a sense, were "rooted in" Gump's employment agreement with his former employer was not enough to establish the requisite nexus. *Id.*

Second, even though the amount of Gump's extended-earnings payments was tied to the level of renewal commissions generated by Gump in the last twelve months of his employment, that fact alone was insufficient to demonstrate that the extended payments were tied to the quantity or quality of the Gump's service. *Id.* at 1129. The Federal Circuit reasoned that "the renewal commissions generated in Gump's last year determine[d] the amount of the extended earnings payment, subject to adjustment, not the right to it"; thus, "[t]he only significance that [could] properly be attached to this amount [was] that it was used as a benchmark to determine how much he would receive if he complied with the agreement." *Id.*

The Federal Circuit also noted that Gump's right to the extended earnings was not dependent his final twelve months of labor because even if he had lost all of his customers, he would have been entitled to the payments (though, under the benchmark, he would have received no money). *Id.* at 1130. In contrast, had Gump not complied with other contractual requirements, by, for example, failing to return his employer's property at the end of his employment, he would not have been entitled to any extended earnings. *Id.* The Federal Circuit held that the

75

amount of the extended earnings was therefore "not tied to the quantity or quality of [Gump's] labor in any meaningful way." *Id.* (internal quotation marks omitted).

Third, the court in *Gump* relied in part on the fact that the payments were subject to adjustments unrelated to the Gump's previous business activities. Notably, the employer "could make deductions from the payments if certain large commercial policies were cancelled in the year following [Gump's] last year of service. This adjustment in the amount he [c]ould receive [wa]s unrelated to the actual quantity or quality of his labor." *Id*. at 1128-29.

In *Schelble v. Commissioner*, the Tenth Circuit also addressed whether the termination payments received by an insurance agent, Schelble, "derived" from his prior business activity. 130 F.3d 1388 (10th Cir. 1997). The court held that, unlike the payments in *Milligan* and *Gump*, Schelble's termination payments did "derive" from his prior labor under the "quantity or quality" test. *Id.* at 1394. The court distinguished the termination payments Schelble received from those Milligan and Gump received, reasoning,

> Although the payments in *Milligan* and Mr. Schelble's payments have similar eligibility requirements such as (1) a minimum [yearly] service requirement; (2) relinquishment of company records and policies; and (3) a covenant not to compete, Mr. Schelble's payments have distinguishing features related to Mr. Schelble's prior services. For example, unlike the plan in *Milligan*, Mr. Schelble must have 400 outstanding policies at his termination to be eligible for extended earnings payments. In addition, in contrast to *Milligan*, the

76

amount of Mr. Schelble's payments was computed based on Mr. Schelble's length of service for the Companies. As an agent for the Companies for over fifteen years, Mr. Schelble's extended earnings payments were calculated using a higher percentage than if he had only been an agent for five or ten years. Furthermore, unlike the payments in *Milligan*, Mr. Schelble's . . . payments were calculated solely on the percentage applied to service fees paid to him during the twelve months preceding the Agreement's termination. No adjustments unrelated to Mr. Schelble's prior services were made in calculating these payments. Based on these distinguishing factors, we conclude Mr. Schelble's payments are sufficiently derived from his prior insurance business to constitute self-employment income subject to self-employment tax under 26 U.S.C. § 1401.

Mr. Schelble also relies on *Gump* . . . . However, the payment scheme in *Gump* is nearly identical to that in *Milligan* and distinguishable from Mr. Schelble's payment scheme. For the same reasons we reject *Milligan*, we also find *Gump* does not apply Mr. Schelble's case.

*Id.* at 1393-94 (internal citation omitted).

Applying the *Newberry* test to Schelble's payments, the Tenth Circuit held that a nexus existed between Schelble's termination payments and his prior labor. *Id.* at 1394. The Court first conceded that, as Schelble argued, the payments arose from the cessation of his employment, not his prior labor. *Id.* But it concluded that there was "[n]evertheless" a nexus because "the right to and amount of payments are tied to the quantity of policies sold for the [employer], the length of Mr. Schelble's prior service and the amount of his prior commissions." *Id.*

77

The Majority contends that *Milligan*, *Gump*, and *Schelble* are inapposite because all three cases involve insurance agents and are therefore distinguishable on four bases. Maj. Op. at 46-48. First, the Majority observes that, unlike sales of Mary Kay's cosmetic products, insurance policies have to be renewed. *Id.* at 47. Second, the Majority notes that the calculation of post-retirement benefits for insurance salesmen is based on methods and concepts that are germane to the insurance business. Third, the Majority suggests that, unlike in the insurance cases, the Program payments here are deferred compensation on the merits. *Id.* at 47. Fourth, the Majority notes that the Mary Kay Programs "are one of a kind" and "unique." *Id.* at 48. In support of this last contention, the Majority observes that one distinction between Mary Kay's Futures Program and the insurance cases is that the insurance cases "do not involve sales networks in foreign countries." *Id.* at 51 n.43.

I agree with the Majority that these are distinctions between the insurance cases and Peterson's case. But I respectfully disagree that these distinctions render *Milligan*, *Gump*, and *Schelble* inapposite. The courts in *Milligan*, *Gump*, and *Schelble* did not explicitly purport to limit their holdings to insurance cases; nor does anything in their analyses suggest that their reasoning is limited to cases involving insurance agents. Instead, each court started with the language of 26 U.S.C. § 1402(a)-(b), recognized the continuing vitality of *Newberry* (a case

78

involving insurance proceeds, but not retired insurance agents), and applied the test to the post-retirement payments at issue.  *See Schelble*, 130 F.3d at 1391-94; *Gump*, 86 F.3d at 1127-30; *Milligan*, 38 F.3d at 1097-1100.

Nor is it clear to me why the distinctions highlighted by the Majority would alter the applicability of these decisions.  The fact that insurance contracts have to be renewed unlike the fungible products sold by Mary Kay suggests only that insurance companies do not need their customers to affirmatively "re-up" as frequently.  To the extent that the Majority means to suggest that the renewable contracts indicate that there is a difference in kind between (a) the relationship of a retired insurance agent to his former customers and employer, and (b) the relationship of a retired NSD to her former network and Mary Kay, I do not see a meaningful difference or how any difference would impact our post-retirement payment analysis.

I also do not think that it matters that insurance companies calculate post-retirement payments to former insurance agents using methods and concepts germane to the insurance industry.  As described above, the *Newberry* nexus analyses in *Milligan*, *Gump*, and *Schelble* turn on whether the payments at issue are "deferred compensation"; whether the payments are for the cessation of business; whether the payments are subject to adjustments unrelated to the former employee's prior labor; whether eligibility for the payments and the determination

79

of the amount of the payments are related to the quantity of the former employees' work, beyond a requirement that the employee have worked some number of years in order to receive the payments; and whether the amount of the payments is dependent on the labor of employees that succeeded the former employee or on the employee's own labor. *See Schelble*, 130 F.3d at 1391-94; *Gump*, 86 F.3d at 1127-30; *Milligan*, 38 F.3d at 1097-1100. As it turns out, all of these inquiries have meaningful application in the context of this case as well.

To the Majority's suggestion that the payments here are deferred compensation, unlike the payments in the insurance cases, I respectfully disagree for the reasons described above. *See supra* at pp. 15-17. And, respectfully, the Majority's fourth distinction—that the Mary Kay Programs are one of a kind because, among other things, they involve sales networks in foreign countries— does not necessarily make them insusceptible to the general analytical framework deployed in *Milligan*, *Gump*, and *Schelble*.

Notably, the Majority itself relies on an insurance case. The Majority cites *Erickson v. Commissioner*, T.C. Memo. 1992-585 (1992), for the proposition that "[p]ayments with the same character as prior commissions constitute income derived from a petitioner's self-employment." Maj. Op. at 45. I disagree with the Majority's gloss on the holding in *Erickson*—there, unlike the payments in *Milligan* and *Gump*, the post-termination payments were directly tied to both the

80

quantity and quality of the former agent's labor, with a guarantee that the payments could not fall below a certain percentage. *See Erickson*, T.C. Memo 1992-585, at *1. But, more importantly, either cases involving insurance agents are or are not, as a class, inapplicable to non-insurance cases.

Guided by *Milligan*, *Gump*, and *Schelble*, I would conclude that a nexus exists between the Family Program payments and Peterson's prior Mary Kay labor, but not with respect to the Futures Program payments. Here, payments under both Programs are tied to the cessation of Peterson's prior Mary Kay labor. In order to receive payments under the Programs, Peterson was required not to compete with Mary Kay. This counsels in favor of holding that the payments are not derived from Peterson's prior labor. *See Milligan* 38 F.3d at 1098 n. 6 (observing that payments derived from an employee's cessation of labor and compliance with a non-competition covenant do not meet the nexus test); *see also Gump*, 86 F.3d at 1128 (payments derived from a former employee's cessation of labor are not derived from the employee's former labor even where the payments are "rooted in" the employee's former employment agreement). But it is not dispositive of the "quality or quantity" nexus inquiry. *See Schelble*, 130 F.3d at 1394.

As for the quantity inquiry, I would hold that the payments under both Programs are tied to the quantity of an NSD's service, but only in the threshold status sense that the *Milligan* court found insufficient, on its own, to establish that

81

payments necessarily "derive" from a taxpayer's prior labor. To be eligible for payments under both Programs, an individual must have served as an NSD for at least 5 years prior to her retirement. If an NSD serves for 15 years prior to retirement, she is eligible to receive payments at a rate of 60%, regardless of her age at retirement. If, however, an NSD retires prior to serving 15 years, the percentage of commissions she receives is based upon her age at retirement, varying from a 40% rate at age 55 to a 60% rate at age 65. Once an NSD reaches age 65, she will receive payments at the 60%, regardless of whether she served for 5 or 25 years. In sum, an NSD's eligibility for receiving Program payments at a particular rate is dependent on her status as either (1) having served at least 5 years and attained the age of 55; or (2) having served 15 years.

These eligibility requirements are akin to the two-year-plus status requirement that the *Milligan* Court found insufficient to satisfy the nexus test on its own. 38 F.3d at 1098. I agree with the *Milligan* Court that, without more, this type of "link between the disputed payments and any business activity carried on . . . does not satisfy the 'derive' requirement." *Id.* As the court in *Milligan* explained, "It is not enough that, had the taxpayer not performed certain services (that were fully compensated for) . . . the taxpayer never would have received the disputed payments." *Id.* Here, the requirements that an NSD perform Mary Kay services for 5 years and reach 55 years of age, or serve as an NSD for 15 years, are

82

threshold eligibility requirements for Program payments. Those status requirements indicate only that the NSD performed services, fully compensated for at the time, sufficient to receive the disputed payments. Therefore, while I would conclude that a relationship exists between the quantity of Peterson's prior labor and the Program payments, that relationship, on its own, does not satisfy the *Newberry* nexus test.

But I would hold that the Family Program payments still meet the nexus test because the amount of payments Peterson received under the Family Program was directly tied to the quality of her Mary Kay labor. The amount Peterson received under the Family Program payments was equal to 60% of the average of her annual commissions for the three years in which she had the highest commissions among the five years preceding her retirement. Like the payments in *Schelble* and unlike the payments in *Milligan* and *Gump*, this amount was not subject to any adjustments, let alone adjustments unrelated to Peterson's prior labor. *Schelble*, 130 F.3d at 1393; *Gump*, 86 F.3d at 1128-29; *Milligan*, 38 F.3d at 1099. Because the amount of the Family Program payments were not subject to any adjustments, Peterson's labor during her three highest commission years in the last five years of service cannot be considered a benchmark akin to Gump's final twelve months of service—the quality of Peterson's labor is determinative of the amount of her payments. *Cf. Gump*, 86 F.3d at 1129-30. As a result, the amount of the payments

Peterson received under the Family Program was entirely dependent on the quality of her prior Mary Kay labor.

In contrast, I would hold that the Futures Program payments do not meet the nexus test because the amount of the payments Peterson received under the Futures Program is entirely independent of the quality of her prior Mary Kay labor. Under the Futures Program, Peterson is entitled to receive 60% of the commissions she *would have* received on wholesale purchases of Mary Kay products by individuals in her network located outside the United States. In other words, the amount of Futures Program payments Peterson is entitled to receive is entirely dependent on the quality of other, non-retired Mary Kay laborers.

The Commissioner argues that the Futures Program payments still "derive from" the quality of Peterson's previous work because the amount of money that her network generated after she retired reflected how well she had trained her network while she was active. The Majority agrees. Maj. Op. at 45 n.36; 46 n.39. I, however, disagree.

In *Milligan*, the Ninth Circuit held that the fact that Milligan's employer could reduce his payments based on how many of his former customers cancelled their insurance policies in the year after his retirement indicated that "[t]he adjusted payment amount depended not upon Milligan's past business activity, but upon the successor agent's future business efforts to retain Milligan's customers."

84

38 F.3d at 1099. The Ninth Circuit determined that that counseled in favor of holding that the payments did not "derive" from Milligan's prior labor. *Id.*

Likewise, in *Gump*, the Federal Circuit held that because Gump's former employer "could make deductions from the payments if certain large commercial policies were cancelled in the year following his last year of service," the payments were "unrelated to the actual quantity or quality of [Gump's] labor." 86 F.3d at 1128-29. Here, the fact that Peterson might receive reduced payments under the Futures Program based entirely on wholesale purchases by members of her former international network similarly counsels in favor of holding that the Futures Program payments are not tied to the quality of Peterson's prior labor and therefore not "derived" from that labor.[8]

Instead, I would hold that the Futures Program payments derive from Peterson's compliance with the agreement's covenant not to compete. The majority contends that the payments did not derive from the covenant not to

---

[8] The Commissioner argued that the payments under both Programs were also tied to the quantity of an NSD's service in that an NSD with 5-14 years of service and who was at least 55 years old could receive a higher payment rate the longer she worked. The Commissioner argued that this is akin to the payments in *Schelble*, where the insurance agent was entitled to a higher percentage of his commission based on his years of service. *Schelble*, 130 F.3d at 1393. In *Schelble*, however, the percentage rate corresponded directly with the insurance agent's years of service. *See id.* ("As an agent for the Companies for over fifteen years, Mr. Schelble's extended earnings payments were calculated using a higher percentage than if he had only been an agent for five or ten years."). Here, in contrast, the rate at which a five-plus year NSD would receive payments was tied directly to her age, not her years of service. Thus, an NSD that retired at the age of 55 with 7 years of service would receive the same rate of Program payments (40%) as an NSD that retired at the age of 55 with 14 years of service.

compete because the covenants were not determinative in Peterson's receiving her post-retirement commissions from the foreign networks she trained. Maj. Op. at 44. But that conclusion conflicts with the language of the non-compete provision itself: "*In consideration* of the rights and privileges contained in the Program *and other valuable consideration* referenced herein, Participant agrees to faithfully observe and comply with the . . . [non-compete] covenants and agreements for so long as Participant is entitled to receive awards under the Program . . . ." On these facts, I would hold that the Futures Program payments are derived from the non-compete agreements and are therefore not subject to the self-employment tax. *See Milligan* 38 F.3d at 1098 n.6.[9]

In sum, I would hold that the Family Programs meet the nexus test and are therefore subject to the self-employment tax. I therefore concur in the portion of the Majority's opinion holding that the Family Program payments are subject to the self-employment tax. The Futures Program payments, on the other hand, are not, in my opinion, sufficiently related to either the quantity or the quality of

---

[9] Without more, the "[i]n consideration of" language does not dictate the conclusion that the Futures Program payments are "derived" from Peterson's compliance with the Program's non-compete provision and not from her prior labor. Indeed, the noncompetition provision of the Family Program contains the same "[i]n consideration of" language, and, as noted above, I would conclude that those payments *do* derive from Peterson's prior Mary Kay labor. The difference, for me, is that unlike the Family Program, where the amount of Peterson's payments depends entirely on the quality of Peterson's efforts in her final five years of her Mary Kay employment, the amount of the Futures Program payments does not depend on Peterson's prior Mary Kay labor. It is the absence of any nexus between the Futures Program payments and Peterson's prior Mary Kay labor *in combination* with the "[i]n consideration of" language that drives me to the conclusion that the Futures Program payments "derive" from Peterson's compliance with that Program's non-compete provision and not from her prior labor.

86

Peterson's prior labor to meet the nexus test.  Instead, those payments appear to be derived from    I therefore respectfully dissent from the portion of the Majority's opinion holding that the Futures Program payments are subject to the self-employment tax.

For these reasons, I respectfully dissent in part, and I concur in part in the judgment.